Filed 1/26/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| USS-POSCO INDUSTRIES, <br><br> Plaintiff, Cross-Defendant, and Respondent, <br><br> v. <br><br> FLOYD CASE, <br><br> Defendant, Cross-Complainant, and Appellant. | A140457 <br><br> (Contra Costa County Super. Ct. No. MSC1102781) |
| USS-POSCO INDUSTRIES, <br> Plaintiff and Respondent, <br> v. <br> FLOYD CASE, <br> Defendant and Appellant. | A142145 <br><br> (Contra Costa County Super. Ct. No. MSC1102781) |

## I. INTRODUCTION

Defendant and appellant Floyd Case voluntarily enrolled in a three-year, employer-sponsored educational program. He agreed in writing that if he quit his job within 30 months of completing the program, he would reimburse his employer, USS-POSCO Industries (UPI), a prorated portion of program costs. Two months after completing the program, Case went to work for another employer. When he refused to reimburse UPI, the company sued for breach of contract and unjust enrichment. Case cross-complained, asserting the reimbursement agreement was unenforceable and UPI had violated the Labor Code and other statutory provisions in seeking reimbursement.

1

The trial court granted UPI's motion for summary judgment on both its complaint and Case's cross-complaint, and subsequently granted UPI's motion for attorney fees for defeating Case's wage claims. In granting the fee motion, the court applied the version of Labor Code section 218.5 in effect at the time of the summary judgment proceedings, rather than the version in effect at the time it awarded fees, which permits fees to a prevailing employer only when the employee's wage claims have been brought in "bad faith."

We affirm the summary judgment, but reverse and remand the attorney fees award. Under California Supreme Court precedent, statutory provisions that alter the recovery of attorney fees are deemed procedural in nature and apply to pending litigation.

## II. BACKGROUND

### A. *Case's Participation in UPI's Training Program*

UPI hired Case in 2007. He initially worked as an entry-level Laborer and Side Trim Operator. As a condition of employment, Case joined Local 1440 of the United Steelworkers of America.

UPI faced a shortage of skilled Maintenance Technical Electrical (MTE) workers. To address this, UPI, after consultation with Local 1440, decided to implement a Learner Program. Thus, in June 2008, the company and Local 1440 entered into a Memorandum of Understanding (MOU) stating UPI would train up to 10 current employees, while continuing to pay their wages and benefits, in an effort to qualify them as MTEs. UPI and the union recognized "that, due to the strong demand for Maintenance Technician Electrical, the Company needs to retain successful candidates as employees for a reasonable period of time in order to recoup its substantial $46,000 investment in their training." UPI and the union therefore agreed UPI "may require candidates in the Learner Program to sign the attached Reimbursement Agreement that would require reimbursement for a portion of the training should a candidate voluntarily terminate employment within 30 months of completion of the Learner Program."

2

The Learner Program required 135 weeks of instruction, 90 weeks of on the job training and 45 weeks of classroom work (partially courses at a local community college, partially other courses). The goal was to complete training within 162 weeks, or just over three years. If a participant successfully completed the program and then passed UPI's MTE test, he or she would be assigned to an MTE vacancy.

The MTE position and Learner Program aligned with Case's desire to work as an engineer. Case understood joining the Learner Program was voluntary. He also understood he did not need to go through the Learner Program or a similar formal educational program to obtain an MTE position. When asked if "going to the MTE learner program [was] the only avenue . . . available to you to become an MTE," Case answered, "No." A prospect could simply take and pass UPI's MTE test. However, Case did not attempt the test prior to participating in the Learner Program because he did not think he had the knowledge to pass. He was also unsure if he would pass if he undertook a self-study program. In any case, the Learner Program allowed him to get trained during the workday instead of after hours, and it would lead to higher pay. Accordingly, he applied for the program and was one of nine selected participants.

Case was informed of the reimbursement obligation during a training session for prospective participants. A presentation slide entitled "Repayment Agreement" told prospects they would "sign an agreement to reimburse a portion of their training cost should they voluntarily terminate employment within 30 months of program completion." The slide, consistent with the MOU, indicated the obligation would be "$46,000 prorated over 30 months."

Case was subsequently presented with a written reimbursement agreement and signed it without objection. Under that one-page agreement, Case acknowledged UPI would pay his "wages, benefits and training expenses" while he was in the Learner Program, but there would be no guarantee participation in the program would insure promotion, transfer, or continued employment with UPI. He further agreed that if he was

3

fired for cause or voluntarily left UPI within 30 months after completing the program, he would, absent a compelling hardship such as a serious injury or family death, refund $30,000 of the expense of his training, less $1,000 per month of subsequent service at UPI.[1]

Two months after completing the Learner Program and obtaining an MTE position, Case left UPI for Lawrence Livermore National Laboratory to work as a high voltage electrician.

**B. *The Lawsuit***

When Case refused to reimburse UPI, the company filed the instant lawsuit alleging breach of contract and unjust enrichment. UPI sought damages of $28,000—that is, $1,000 per month that remained in Case's 30-month earn-back period.

Case, in turn, filed a cross-complaint on behalf of himself and an asserted class of individuals who signed the same training reimbursement agreement. The first cause of action, for declaratory relief, alleged the agreement was unlawful because: (a) it violated Labor Code[2] sections 221, 222, and 223 (regarding wages), 401–410 (governing bonds), 450 (governing employee expenditures), 3751 (regarding provision of workmens' compensation insurance), and 2802, subd. (a) (regarding employer payment of costs of business operations); (b) it violated the Federal Fair Labor Standards Act's "free and clear" payment requirement and its requirement that an employer negotiate with an

---

[1] UPI and the union had arrived at the $46,000 per person cost figure in the MOU for the purpose of having some tangible estimate of costs. UPI then kept track of actual costs as it implemented the Learner Program and produced evidence of an investment of over $500,000 in setting up the program, which was only run once. Big ticket items included $170,000 for creation of lab space at the community college, over $225,000 for "trainers," tens of thousands of dollars for a variety of other equipment, and $30,000 for program administration. UPI also paid in excess of $3,000 for Case's community college tuition fees and books. It thus estimated Case's actual share of training costs at over $60,000.

[2] All further statutory citations are to the Labor Code unless otherwise indicated.

4

employee's union; (c) it violated Business and Professions Code section 16600 (governing restraints on the right to practice a profession); and (d) it lacked consideration. The second cause of action alleged the agreement was an unfair business practice under Business and Professions Code section 17200. The third through eighth causes of action alleged direct violations of various Labor Code provisions raised in the first cause of action, namely sections 221, 222, 223, 400–410, 2802, and 432.5. The prayer sought a declaration that the reimbursement agreement was invalid, disgorgement of any payments made by employees under the agreement, civil penalties under the Labor Code Private Attorney General Act (PAGA; § 2699), and attorney fees and costs.

UPI subsequently moved for summary judgment on its complaint and Case's cross-complaint, asserting the reimbursement agreement was valid and not unlawful under any theory Case raised in his cross-complaint.

The trial court granted UPI's motion, and the parties thereafter stipulated to a judgment in favor of UPI in the amount of $28,000 plus prejudgment interest and costs.[3]

On December 5, 2013, pursuant to section 218.5, UPI moved for $166,798.50 in attorney fees for successfully defending against three of the Labor Code claims asserted in Case's cross-complaint (for alleged violations of §§ 221, 222 & 223). In justifying the amount sought, UPI claimed it had litigated the case aggressively in part because of the class action allegations and potential civil penalties under various code provisions, including PAGA (assuming Case could have satisfied the requirements of that statute).

Case opposed the motion. He first maintained section 218.5, as amended effective January 1, 2014, authorizes fees to an employer only if the employee's suit is brought in bad faith and he had not asserted his cross-claims in bad faith. He second argued UPI's

---

[3] Despite the stipulated final judgment, we may review the summary judgment rulings adverse to Case, and UPI does not challenge Case's ability to appeal. (See *Villano v. Waterman Convalescent Hospital, Inc.* (2010) 181 Cal.App.4th 1189, 1198 [105 Cal.Rtpr.3d 276].)

claimed fees were excessive, the wage claims added no real work for UPI's counsel, and PAGA's one-way fee shifting statute (which favors only prevailing employees) did not support any fee award to UPI.

Applying the pre-2014 version of section 218.5, the trial court granted UPI's fee motion, but cut the requested amount in half, awarding $80,000.

## III. DISCUSSION

### A. *Summary Judgment*

" 'On appeal after a motion for summary judgment has been granted, we review the record de novo,' " considering all the admissible evidence submitted in support and opposition. (*Horne v. District Council 16 International Union of Painters & Allied Trades* (2015) 234 Cal.App.4th 524, 534 [183 Cal.Rtpr.3d 879].) "A motion for summary judgment is properly granted 'if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' (Code Civ. Proc., § 437c, subd. (c).)" (*Ibid.*)

#### 1. *Labor Code Sections 2802, 2804 and 450*

Invoking Labor Code sections 2802, 2804 and 450, which prevent employers from passing certain operating expenses on to employees, Case contends the reimbursement agreement is an unlawful attempt to foist workforce costs onto employees. None of these statutes, however, is implicated by a strictly voluntary, optional training program of the sort UPI offered here.

Section 2802 provides in pertinent part, "An employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties . . . ." (§ 2802, subd. (a); *Cochran v. Schwan's Home Service, Inc.* (2014) 228 Cal.App.4th 1137, 1144 [176 Cal.Rtpr.3d 407].) Section 2804 provides that this indemnification requirement cannot be waived by contract. (§ 2804; *Edwards v. Arthur Andersen LLP* (2008) 44 Cal.4th 937, 951–952 [81 Cal.Rtpr.3d 282, 189 P.3d 285] (*Edwards*).)

6

Section 2802 only applies, however, to expenditures made or losses sustained by an employee, and then, only to those expenditures or losses an employee must "necessarily incur." (*Gattuso v. Harte-Hanks Shoppers, Inc.* (2007) 42 Cal.4th 554, 567 [67 Cal.Rptr.3d 468, 169 P.3d 889]; see also *Carter v. Entercom Sacramento, LLC* (2013) 219 Cal.App.4th 337, 346 [161 Cal.Rptr.3d 782] [if employer offered legal counsel to employee, it would not be "necessary" for employee to hire own counsel]; *Los Angeles Police Protective League v. City of Los Angeles* (1994) 27 Cal.App.4th 168, 177 [32 Cal.Rptr.2d 574] ["This right to indemnity encompasses only the right to indemnity for *necessary* expenditures."].) Thus, the elements of a section 2802 claim are: "(1) the employee made expenditures or incurred losses; (2) the expenditures or losses were incurred in direct consequence of the employee's discharge of his or her duties, or obedience to the directions of the employer; and (3) the expenditures or losses were necessary." (*Cassady v. Morgan, Lewis & Bockius LLP* (2006) 145 Cal.App.4th 220, 230 [51 Cal.Rptr.3d 527].)

Here, Case, himself, made no expenditure, nor suffered any loss, in direct consequence of the discharge of his duties or in obedience to the directions of UPI. Rather, it was UPI that fronted the costs of his voluntarily undertaken advanced training.

And even if Case could be said to have made a qualifying expenditure or incurred a loss, such expenditure or loss was not necessary. There were at least three avenues to securing an MTE position: (1) pass the MTE test without any additional education or training; (2) pass the MTE test after self study or self-arranged study; and (3) pass the MTE test after enrolling in and completing UPI's Learner Program. As Case admits, an UPI employee could have chosen options 1 or 2, and owed UPI nothing. Case, however, voluntarily chose option 3, presumably because he would get training during the workday, would earn wages during the lengthy training period, and would obtain the training without any upfront cost and potentially without any cost at all. In short, the educational expenses Case ultimately incurred were a matter of personal choice—they

7

were not an employer-imposed requirement of either continued employment as a laborer and side trim operator, or of the MTE position he sought.

Accordingly, the *In re Acknowledgment Cases* (2015) 239 Cal.App.4th 1498 [192 Cal.Rtpr.3d 337], on which Case relies, are readily distinguishable. In fact, these consolidated cases highlight the important distinction between necessary and unnecessary expenditures. The *In re Acknowledgment Cases* addressed the City of Los Angeles's requirement that all new police officers attend an academy which included not only state-mandated peace officer standards and training (POST) certification, but also supplemental training specific to the city's law enforcement needs. Concerned that it was training officers, only to see them depart for other departments, the city sought reimbursement from any officer who voluntarily left its force within five years of graduating. (*Id.* at pp. 1501, 1505–1507.) The appellate court held that because POST certification is a state-imposed requirement for any peace officer which can be obtained through a variety of programs, it is not an "employer-mandated" expense and therefore is not an "expense of discharging the duties of employment" with the city under section 2802. (*In re Acknowledgement Cases*, at p. 1507.) However, because the city's additional training, required of all new city officers, is city-specific and is provided solely by the city, it is an "employer-mandated" expense for which the city cannot seek reimbursement. (*Id.* at pp. 1507–1508.)

The Learner Program, in contrast, was not required of any UPI employee, even those interested in becoming a MTE. Rather, the program was entirely voluntary and only one of the ways in which an employee interested in becoming a MTE could secure the training for that occupation. That the program provided training for a readily transferable occupation—as illustrated by Case's move to LLNL—also made it much more akin to basic POST than to an employer-specific training program like that required by, and provided solely by, the City of Los Angeles.

8

Turning to section 450, subdivision (a) of that section provides, "No employer, or agent or officer thereof, or other person, may compel or coerce any employee, or applicant for employment, to patronize his or her employer, or any other person, in the purchase of any thing of value." (§ 450, subd. (a).) As discussed, no compulsion or coercion was brought to bear on Case to participate in the Learner Program. Rather, the program was entirely voluntary.

For similar reasons, there was no violation of the statutes pertaining to employee bonds. Section 401 requires employers to pay for bonds if they are "required," and so does not apply here. (§ 401.) Section 402 prohibits the demanding, exacting, or accepting of any "cash bond" for most purposes. (§ 402.) While a cash bond can take many forms (§ 406), here Case put up no cash. Rather, it was UPI that fronted his training expenses, and no deduction was ever made from his paid wages. Thus, *Quillian v. Lion Oil Co.* (1979) 96 Cal.App.3d 156 [157 Cal.Rptr. 740], which both parties cited in connection with the bond laws, is inapposite. That case concerned a reduction in wages in the amount of a business shortage, a scenario entirely different from that here.

### 2. *Business and Professions Code Section 16600*

Case contends the reimbursement agreement is also an invalid restraint on employment under Business and Professions Code section 16600, which provides relevant part, "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." (Bus. & Prof. Code, § 16600.) A like argument was rejected in *City of Oakland v. Hassey* (2008) 163 Cal.App.4th 1477 [78 Cal.Rptr.3d 621] (*Hassey*), and we reach the same conclusion here.

In *Hassey,* a new police officer recruit agreed to a conditional offer of employment. The agreement, authorized by a MOU with the police officers' union, provided that the new officer would be trained at the department academy at a cost of $8,000 (exclusive of wages), and if he left within the first five years of service, he would

9

owe the department a prorated share of that cost. (*Id.* at p. 1483.) The officer completed the academy, but left within his first year of service. (*Id.* at p. 1484.)

With respect to the officer's claim that the reimbursement agreement violated Business and Professions Code section 16600, the appellate court stated, "To the extent that Hassey argue[d] that his agreement to repay Oakland was an impermissible covenant not to compete . . . , an identical argument with respect to a Wisconsin anticompetition statute was specifically rejected in *Heder*. ([*Heder v. City of Two Rivers, Wisconsin* (7th Cir. 2002) 295 F.3d 777, 780] [reimbursement agreement did not restrict employee's ability to compete with city after leaving its employ].)[4] We recognize that in California, 'the general rule is that covenants not to compete are void' (*Kelton v. Stravinski* (2006) 138 Cal.App.4th 941, 946 . . . ), whereas under the Wisconsin law analyzed in *Heder*, restrictive covenants in employment contracts are permitted if they are 'reasonably necessary for the protection of the employer or principal.' (Wis. Stat. § 103.465; cf. *Application Group, Inc. v. Hunter Group, Inc.* (1998) 61 Cal.App.4th 881, 900 [72 Cal.Rptr.2d 73] [Bus. & Prof. Code, § 16600 ' "has specifically been held to invalidate employment contracts which prohibit an employee from working for a competitor when the employment has terminated, unless necessary to protect the

---

[4] *Heder* explained why a state, as a matter of public policy, might embrace education reimbursement agreements. An employee receives "considerable benefits," such as training and enhanced compensation and does not have to underwrite his or her own education. The employer obtains a better skilled work force. And the community benefits from the stability of local skilled labor and incentives to remain in the local work force. (*Heder v. City of Two Rivers*, *supra*, 295 F.3d at pp. 781–782.) In addition, numerous industries require specialized training as a perquisite to employment. "If an employer may require employees to pay up front, why can't the employer bear the expense but require reimbursement if an early departure deprives the employer of the benefit of its bargain? A middle ground also would be feasible (and lawful): The employer could require the worker to pay for his own training but lend the worker the money and forgive repayment if he sticks around. . . . If that system is lawful, as it is, then the economically equivalent system" of straightforward reimbursement agreements is as well." (*Ibid.*)

employer's trade secrets. [Citation.]" '].)  The fact remains, however, that nothing in the agreements Hassey signed 'restrained [him] from engaging in [his] lawful trade, business or profession.' (*Kolani v. Gluska* (1998) 64 Cal.App.4th 402, 407 [75 Cal.Rptr.2d 257] [analyzing Bus. & Prof. Code, § 16600].)  Nothing prevented him from working for another police department, or anywhere else, for that matter." (*Hassey*, *supra*, 163 Cal.App.4th at p. 1491, fn. omitted.)

We agree with the reasoning of *Hassey* and, likewise, conclude Case has no claim under Business and Professions Code section 16600.  He voluntarily agreed to participate the training program and understood UPI would front all the costs of the program and expected reimbursement of training costs if he chose to leave within 30 months of completing the program.  This was an agreement concerning advanced educational costs.  It did not restrain Case from working for a competitor or any other entity.  Indeed, Case quit UPI and went to work elsewhere, and he was entirely free to do so.  He had also agreed to reimburse UPI for the costs it fronted for his advanced training, a benefit Case retained despite his departure.

Case maintains *Hassey* is no longer good law in light of the Supreme Court's decision in *Edwards*, *supra*, 44 Cal.4th 937, which considered "[t]o what extent does Business and Professions Code section 16600 prohibit employee noncompetition agreements." (*Id.* at p. 941, fn. omitted.)  The court broadly answered that an agreement violates this statutory provision even if it only "limits," rather than "prohibits," an employee's practice of "her profession, trade, or business." (*Id.* at pp. 946–947.)  Accordingly, courts need not evaluate the reasonableness of a restraint—because all restraints are forbidden. (*Id.* at pp. 949–950.)

The court therefore "conclude[d] that [employer] Andersen's noncompetition agreement was invalid.  As the Court of Appeal [had] observed, 'The first challenged clause prohibited Edwards, for an 18-month period, from performing professional services of the type he had provided while at Andersen, for any client on whose account

11

he had worked during 18 months prior to his termination.  The second challenged clause prohibited Edwards, for a year after termination, from "soliciting," defined by the agreement as providing professional services to any client of Andersen's Los Angeles office.'  The agreement restricted Edwards from performing work for Andersen's Los Angeles clients and therefore restricted his ability to practice his accounting profession.  [Citation.]  The noncompetition agreement that Edwards was required to sign before commencing employment with Andersen was therefore invalid because it restrained his ability to practice his profession." (*Edwards, supra*, 44 Cal.4th at p. 948.)

*Edwards* thus addressed a quintessential noncompete agreement that expressly restrained an employee from working on certain matters and from soliciting certain former clients.  The agreement at issue in *Hassey* and the one Case signed here did no such thing.  Rather, the reimbursement agreement Case signed concerned the reimbursement of costs of a voluntarily attended education program.

Nor do the cases cited in *Edwards* and relied on by Case compel a different result here.  In *Muggill v. Reuben H. Donnelley Corp.* (1965) 62 Cal.2d 239, 243 [42 Cal.Rptr. 107, 398 P.2d 147] (*Muggill*), for example, a "provision forfeiting plaintiff's pension rights if he works for a competitor restrain[ed] him from engaging in a lawful business and [was] therefore void."  In *Chamberlain v. Augustine* (1916) 172 Cal. 285, 286–288 [156 P. 479] (*Chamberlain*), an employee agreed to "pay the sum of . . . $5,000 as liquidated damages" if he became involved in a competing business, which impermissibly "operate[d] to restrain Augustine from carrying on the business mentioned." (*Id.* at p. 288.)  *Muggill* is readily distinguishable because it dealt with clawing back an employee's earnings if he chose to work for a competitor, and *Chamberlin* is similarly distinguishable because it dealt with liquidated damages, or a "price," for choosing to compete.  The reimbursement agreement here did not curb

12

competition, but rather, addressed a voluntarily undertaken and valuable educational opportunity.[5]

*Golden v. California Emergency Physicians Medical Group* (9th Cir. 2015) 782 F.3d 1083 (*Golden*), which Case emphasized at oral argument, is also distinguishable. The issue in *Golden* was whether Business and Professions Code section 16600 is limited to traditional noncompete clauses or can apply to other kinds of agreements. The parties, a physician terminated from an emergency medical practice and the medical consortium providing those services to numerous facilities, had reached a settlement in court that included an agreement the physician would not work for the consortium or at any facility it serviced or owned in the future. (*Id.* at pp. 1084–1085.) When the plaintiff refused to sign the written agreement memorializing the settlement, including because of its no-work provision, his former attorney and the consortium successfully moved to enforce it. (*Id.* at p. 1085.)

The Ninth Circuit reversed and remanded, concluding section 16600 is not limited to standard noncompete clauses and the district court should determine whether the no-work provision constituted a restriction of "substantial character" on the plaintiff's practice. (*Golden, supra*, 782 F.3d at pp. 1092–1093.) The circuit court discussed *Chamberlain* and *Edwards*, discerning nothing in those cases limiting the kind of provision subject to section 16600. (*Golden*, at pp. 1090–1091.) It also observed *Hassey* did not purport to limit the application of the statute, and in a single sentence, questioned

---

[5] Case also cited to a Michigan Supreme Court case, *Sands Appliance Services, Inc. v. Wilson* (2000) 463 Mich. 231, 243 (*Sands*). However, *Sands* actually undercuts his argument. Although the court invalidated a mandatory condition of employment to pay a weekly sum out of wages toward education, it also pointed out: "some employers offer to fund employees' educations with the understanding that the employees will repay, unless they remain with the employer for a specific period. Such programs do not violate [Michigan's fringe benefit law]. . . . As with reimbursement for personal phone calls and paying for employer-provided tools removed after a job ends, they are optional and not a condition of employment or continued employment." (*Ibid.*)

13

whether "perhaps" the outcome in *Hassey* should have been different. (*Id.* at p. 1092.) For all the reasons we have discussed, we do not share this concern. Repayment of the fronted costs of a voluntarily undertaken educational program, the benefits of which transcend any specific employment and are readily transportable, is not a restraint on employment.

### 3. *National Labor Relations Act, title 29 United States Code section 159(a)*

Case also claims the reimbursement agreement was the result of improper direct bargaining with him, circumventing the collective bargaining process envisioned by the National Labor Relations Act (NLRA; 29 U.S.C. §§ 158(a)(5)& 159(a)). Case, however, reads the direct bargaining prohibition far too broadly.

The NLRA makes it unlawful for a covered employer to "refuse to bargain collectively with the representatives of his employees." (29 U.S.C. § 158(a)(5).) Further, "Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment . . . ." (29 U.S.C. § 159(a).)

According to Case, the United States Supreme Court in *J.I. Case Co. v. N.L.R.B.* (1944) 321 U.S. 332 [64 S.Ct. 576, 88 L.Ed. 762] (*J.I. Case*), construed these statutory requirements as barring an employer from negotiating any contract with an individual employee represented by a union. The Supreme Court never went as far as Case suggests.

While the high court held an employer cannot rely on previously-negotiated individual employment contracts to defeat collective bargaining, it also "held an employee's separate individual contract that is consistent with [a] collective bargaining agreement may be enforced." (*Willis v. Prime Healthcare Services, Inc.* (2014) 231 Cal.App.4th 615, 630–631 [180 Cal.Rptr.3d 397].) The court continued: "We know

14

of nothing to prevent the employee's, because he is an employee, making any contract provided it is not inconsistent with a collective agreement or does not amount to or result from or is not part of an unfair labor practice.  But in so doing the employer may not incidentally exact or obtain any diminution of his own obligation or any increase of those of employees in the matters covered by collective agreement." (*J.I. Case*, *supra*, 321 U.S. at p. 339.)

Case offered no evidence the reimbursement feature of the Lerner Program was in any way inconsistent with the union-negotiated MOU approving the program or any other collective bargaining agreement covering Case's employment.  (Cf. Code Civ. Proc., § 437c, subd. (p)(1); *California Bank & Trust v. Lawlor* (2013) 222 Cal.App.4th 625, 630 [166 Cal.Rptr.3d 38] [burden on defendant to show triable issue as to affirmative defense].)  To the contrary, the MOU expressly authorized a reimbursement agreement calling for repayment of a portion of the Learner Program costs if a participant left within 30 months of completing it.  While the MOU estimated UPI would need to recoup $46,000 in program costs per participant and the reimbursement agreement Case signed called for reimbursement of only $30,000, this was not an "inconsistency" and certainly did not increase any obligation he had under the MOU.  And while no party provided a copy of the exemplar reimbursement agreement attached to the MOU, that, alone, does not raise a triable issue that the reimbursement agreement was inconsistent with the MOU.

### 4. *Consideration*

Case maintains the reimbursement agreement also lacked consideration because UPI had no obligation to keep Case employed and, thus, no obligation to provide education, which Case views as "the only possible consideration listed in the Reimbursement Agreement."  Case's view of the bargained-for exchange is too constrained.

On entering the program, Case held a new position of Learner, which meant he would remain on UPI's payroll while *additionally* getting classroom and on-the-job training, the costs of which UPI would front. While Case was not guaranteed a promotion, transfer, or continued employment, exactly the same had been true with respect to his previous position. The exchange, frankly, is obvious: Case got continued wages and fronted education costs, and UPI got Case's agreement to repay those costs if he both completed the training and left the company before it could benefit from the investment. That either Case or UPI could have terminated the agreement by ending the employment relationship at some point during the educational program does not render illusory the parties' bargained-for exchange—or require us to ignore the substantial benefits Case obtained every day he spent on the payroll receiving advanced training with no upfront cost and potentially no cost at all to him.

**5. *Unconscionable Contract of Adhesion***

Case asserts the reimbursement agreement was an unconscionable contract of adhesion primarily because he views the $30,000 value placed on the MTE training as scandalous in comparison to the cost of tuition and books required for the classroom component of the program, which could be purchased from the local community college for approximately $3,000.

" ' "[T]he doctrine of unconscionability has both a procedural and a substantive element, the former focusing on oppression or surprise due to unequal bargaining power, the latter on overly harsh or one-sided results." ' " (*Sanchez v. Valencia Holding Company, LLC* (2015) 61 Cal.4th 899, 910 [190 Cal.Rptr.3d 812, 353 P.3d 741] (*Sanchez*).) The prevailing view is that both elements of unconscionability must be present before a court can exercise its discretion to not enforce a contract or clause as unconscionable. (*Ibid.*) But both elements need not be present in the same degree. (*Ibid.*) " '[T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is

unenforceable, and vice versa.' " (*Peng v. First Republic Bank* (2013) 219 Cal.App.4th 1462, 1469 [162 Cal.Rptr.3d 545] (*Peng*).)

" 'The procedural element of an unconscionable contract generally takes the form of a contract of adhesion . . . .' [Citation.] An adhesive contract is defined as ' "a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." ' " (*Peng, supra*, 219 Cal.App.4th at p. 1469.) " 'Where a party with superior bargaining power has imposed contractual terms on another, courts must carefully assess claims that one or more of these provisions are one-sided and unreasonable.' " (*Ibid.*) For a term to be substantively unconscionable, though, it must be in the universe of being "overly harsh," "unduly oppressive," or "so one-sided as to shock the conscience." (*Sanchez, supra*, 61 Cal.4th at pp. 910–911.) " '[U]nconscionability requires a substantial degree of unfairness beyond "a simple old-fashioned bad bargain." ' " (*Ibid.* italics omitted.)

An "agreement as to price, like any other contract provision, may be found unconscionable. [Citation.] '[I]t is clear that the price term, like any other term in a contract, may be unconscionable. [Citations.] Allegations that the price exceeds cost or fair value, standing alone, do not state a cause of action. [Citations.] Instead, plaintiff's case will turn upon further allegations and proof setting forth the circumstances of the transaction. [¶] The courts look to the basis and justification for the price [citation], including "the price actually being paid by . . . other similarly situated consumers in a similar transaction." [Citation.] . . . While it is unlikely that a court would find a price set by a freely competitive market to be unconscionable [citation], the market price set by an oligopoly should not be immune from scrutiny. Thus courts consider not only the market price, but also the cost of the goods or services to the seller [citations], the inconvenience imposed on the seller [citation], and the true value of the product or

service [citation].' " (*Wayne v. Staples, Inc.* (2006) 135 Cal.App.4th 466, 481 [37 Cal.Rptr.3d 544] (*Wayne*).)

The reimbursement agreement is not procedurally unconscionable. To begin with, the MOU (which had estimated the education program's cost at $46,000 per participant, rather than the $30,000 ultimately specified in the reimbursement agreement), came into being following negotiations between UPI and Case's union, two entities with parity in bargaining power. (See *Madden v. Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 711 [131 Cal.Rptr. 882, 552 P.2d 1178] (*Madden*) ["Although plaintiff did not engage in the personal negotiation of the contract's terms, she and other public employees benefitted from representation by a board, composed in part of persons elected by the affected employees, which exerted its bargaining strength to secure medical protection for employees on more favorable terms than any employee could individually obtain."].)

Additionally, the reimbursement terms were no surprise. Not only was Case aware of them before he ever committed to the program or saw the reimbursement agreement, the agreement is a single page and the reimbursement obligation is clearly spelled out. (See *Wayne*, *supra*, 135 Cal.App.4th at pp. 481–482 [clear disclosure of disputed term weighs against procedural unconscionability].)

There were also other realistic options for obtaining an MTE position—taking and passing the test, without further study or with self-directed study and participation in community college classes. (*Madden, supra*, 17 Cal.3d at p. 711 ["In many cases of adhesion contracts, the weaker party lacks not only the opportunity to bargain but also any realistic opportunity to look elsewhere for a more favorable contract . . . . Plaintiff, on the other hand, enjoyed the opportunity to select from among several medical plans negotiated and offered by the board, some of which did not include arbitration provisions, or to contract individually for medical care."]; *Morris v. Redwood Empire Bancorp* (2005) 128 Cal.App.4th 1305, 1320 [27 Cal.Rptr.3d 797] [procedural unconscionability may be defeated by availability of meaningful choice].)

18

And finally, Case was not contracting for necessities, but for an optional, advanced educational program. (See *Ibid*.)

Because there was no procedural unconscionability here, we need not even consider substantive unconscionability.

Even if we did, we would conclude the reimbursement agreement is also not substantively unconscionable. There is not a shred of evidence the union was somehow colluding with UPI to gouge employees by estimating the cost of the Learning Program at $46,000 per participant. Rather, all the evidence indicates this was a reasonable estimate for the three-year program. Compared with the initial estimated cost, Case's obligation to reimburse up to $30,000 was eminently reasonable. Although Case disputed the necessity and reality of some of the more than $500,000 in costs UPI enumerated for the Learner Program, it cannot be disputed UPI's investment in Case and the other participants went well beyond providing the $3,000 in tuition and books for classroom instruction, which accounted for only one-third of total training time. Case's focus on those academic costs is therefore unavailing. There also was no evidence UPI "over-reported" expenditures because some purchased items were ultimately "donated" to the community college so it could carry out a portion of UPI's training. Whether ultimately donated or not, these were costs UPI incurred in establishing and conducting the program.

In sum, there is no evidence the nearly three-year Learner Program was improperly valued, let alone so misvalued as to render the reimbursement agreement substantively unconscionable. (See *Wayne*, *supra*, 135 Cal.App.4th at pp. 482–483 [price must shock the conscious, not merely be unreasonable].)

### 6. *Taking of Wages Under Section 221, 222 and 223*

Finally, Case asserts the $28,000 reimbursement UPI seeks is an unlawful garnishment or withholding of "wages" under sections 221, 222, and 223. However, section 221, 222, and 223 "address proper payment of wages, an issue not contemplated

by [an] agreement to repay . . . for training expenses." (*Hassey*, *supra*, 163 Cal.App.4th at p. 1490.)

Case nonetheless asserts he had valid wage claims because UPI's initial complaints sought to recoup wages. They did not. True, paragraph 7 in both the original and first amended complaints stated each employee in the Learner Program represented an investment of approximately $150,000, including wages, benefits, and training expenses for the 135-week program. (1 AA 2, 6.) But the complaints only sought $28,000 in training costs under the reimbursement agreement. (1 AA 2, 6.) Thus, while the complaints may have referenced wages paid to Case, they in no way alleged any part of the $28,000 sought was "wages" under any provision of the Labor Code.

**B. *Attorney Fees***

After prevailing on its summary judgment motion, UPI sought attorney fees under section 218.5 because it had prevailed on three Labor Code wage claims—taking wages (§ 221), withholding wages (§ 222), and reducing wages (§ 223)—raised in Case's first amended cross-complaint. Applying the version of section 218.5 in effect at the time of the summary judgment, the court awarded UPI fees, but only half the amount it had requested. Case does not challenge the amount of fees awarded ($80,000), but contends a newer version of the statute applied, and under it, UPI is not entitled to any fee award. We agree the newer version of the statute applies and remand for further proceedings.

**1. *The New Version of Section 218.5 Governs This Case***

Section 218.5, with certain exceptions not relevant here, governs the award of attorney fees in "any action brought for the nonpayment of wages, fringe benefits, or health and welfare or pension fund contributions." (§ 218.5, subd. (a).) In such actions, "the court shall award reasonable attorney's fees and costs to the prevailing party if any party to the action requests attorney's fees and costs upon the initiation of the action." (*Ibid.*)

Prior to 2014, section 218.5 did not distinguish between prevailing employers and employees. It was a true "two way" fee shifting statute that awarded fees to the winner, whether employee or employer. (*Kirby v. Immoos Fire Protection, Inc.* (2012) 53 Cal.4th 1244, 1248 [140 Cal.Rptr.3d 173, 274 P.3d 1160].) An amendment to section 218.5, effective January 1, 2014, changed this. Now, if an employer defeats an employee's wage action, "attorney's fees and costs shall be awarded . . . only if the court finds that the employee brought the court action in bad faith." (§ 218.5; Stats. 2013, ch. 142 (S.B.462), § 1.)

Case asserts the trial court should have applied the new version of section 218.5 since it did not rule on UPI's fee motion until after its effective date. He thus contends the court erred in failing to determine whether he brought his wage cross-claims in "bad faith." He further contends the record does not show bad faith as a matter of law and therefore UPI is not entitled to any fee award. UPI maintains, in turn, that the new version of section 218.5 cannot be applied retroactively and thus does not apply to this lawsuit. In its view, since Case has not challenged the amount of fees awarded, the fee award should be affirmed.

The general rule is that absent a clear, contrary indication of legislative intent, we interpret statutes to apply prospectively. (*Quarry v. Doe I* (2012) 53 Cal.4th 945, 955 [139 Cal.Rptr.3d 3, 272 P.3d 977] (*Quarry*).) In other words, when construing statutes, we presume they do not apply retroactively unless the Legislature has said otherwise expressly or unmistakably. (*Ibid.*) Numerous general statutory provisions are considered to codify or relate to this general rule. (*Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1207–1208 [246 Cal.Rptr. 629, 783 P.2d 585] (*Evangelatos*), citing Civ. Code, § 3 ["[n]o part of [this Code] is retroactive, unless expressly so declared."]; Code Civ. Proc., § 3 ["[n]o part of [this Code] is retroactive, unless expressly so declared."]; Lab Code, § 4["No action or proceeding commenced before this code takes effect, and no right

21

accrued, is affected by the provisions of this code, but all procedure thereafter taken therein shall conform to the provisions of this code so far as possible."].)

But this general rule and these statutes, while seemingly straightforward, do not address the question of whether a statute, as applied, should be viewed as having only a benign "prospective" effect or a possibly troubling "retroactive" effect. (*Quarry*, *supra*, 53 Cal.4th at p. 955; *Evangelatos*, *supra*, 44 Cal.3d at pp. 1205–1206 [concluding statute, if applied, would have retroactive effect]; *id.* at pp. 1207–1208 [next concluding, under general rule, statute should *not* be interpreted to be retroactive, and so not deciding whether the effect would be constitutional]; *Wood v. McGovern* (1985) 167 Cal.App.3d 772, 775–776, fn. 6 [213 Cal.Rptr. 498] (*Wood*) [section 3 of the Civil Code does not answer whether provision under that code might have retroactive effect].)

Whether a statute has "prospective" or "retroactive" effect is not easily determined. (See *Quarry*, *supra*, 53 Cal.4th at p. 955; *Californians For Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 230 [46 Cal.Rptr.3d 57, 138 P.3d 207].) Courts are to consider the nature and extent of the change the statute brings about, and the relationship between the new rule of law and the relevant past events subject to the rule. They are also to take into account fair notice to, reasonable reliance by, and settled expectations of those subject to the new rule. (*Quarry*, *supra*, 53 Cal.4th at pp. 955–956.)

Generally, "a law has a retroactive effect when it functions to ' " 'change[] the legal consequences of past conduct by imposing new or different liabilities based upon such conduct.' " ' " (*Quarry, supra*, 53 Cal.4th at p. 956.) If preexisting rights or obligations are substantially affected, then application of a statute to preenactment conduct is retroactive and forbidden, absent an express legislative intent to permit such retroactive application. If preexisting rights are not so affected, then application of a statute to preenactment conduct is prospective and therefore permitted. (*Elsner v. Uveges* (2004) 34 Cal.4th 915, 937 [22 Cal.Rptr.3d 530, 102 P.3d 915] (*Elsner*).)

22

"Changes to the law, however, are not necessarily considered retroactive even if their application 'involve[s] the evaluation of civil or criminal conduct occurring before enactment.' " (*Quarry*, *supra*, 53 Cal.4th at p. 956.) For instance, changes to rules governing pending litigation, such as those changing procedures to be followed or applicable evidentiary rules, "frequently have been designated as prospective, because they affect the future; that is, the future proceedings in a trial. The prospective label applies even though the trial concerns conduct that occurred prior to the enactment of the new law." (*Ibid.*; *Elsner*, *supra*, 34 Cal.4th at p. 937.) At bottom, we look to the function, not the form, or the new statute. (*Elsner*, at pp. 936–937.)

Looking at the legislation amending section 218.5, we discern no expressed intent, one way or the other, as to its retroactivity. Accordingly, we must consider whether the amendment actually has retroactive effect and thus is inconsistent with the presumption favoring prospective application.

Under the general retroactivity principles just recited, legislation changing when attorney fees are available could readily be said to change the legal consequences of past conduct and substantially affect preexisting rights and obligations. Certainly, a litigant suddenly deprived of a potentially large fee award, or conversely facing such an award, would view its rights and obligations as substantially modified. Viewed as such, the new legislation, absent clear legislative intent to the contrary, would apply only prospectively.

And this is the view federal courts, including the United States Supreme Court, have taken when considering federal fee statutes. For instance, in *Martin v. Hadix* (1999) 527 U.S. 343, 349–350 [119 S.Ct. 1998, 144 L.Ed.2d 347] (*Martin*), the Supreme Court considered the applicability of a newly enacted fee cap in the Prison Litigation Reform Act of 1995 (PLRA; 42 U.S.C. § 1997e(d)(3)). Prior to the legislation, prisoners' attorneys were receiving $150 per hour pursuant to court orders under another statute, title 42 United States Code section 1988. The PLRA reduced this rate. The high court ruled the attorneys were entitled to recover the higher amount for pre-PLRA work—they

23

had reasonably relied on the $150 rate, and to apply the PLRA to pre-enactment work would unfairly attach new legal consequences to completed conduct and upset the parties' expectations. (*Id.* at pp. 349, 358–360.)

In *Summers v. Department of Justice* (D.C. Cir. 2009) 569 F.3d 500, 503 (*Summers*), the Court of Appeals considered a 2007 statute expanding the recoverability of fees against the government under the Freedom of Information Act. Prior to the new legislation, fees were not recoverable where there was a settlement; afterwards, a settlement that resulted in a change of an agency's position could, under some circumstances, support a fee award. (*Id.* at p. 503.) The circuit court concluded the new statute, if applied to a pending case that had been settled on the merits, would improperly expose the government to fees based on "past conduct." (*Summers*, at p. 503.) The government's decision whether to litigate or settle such a case likely depended on an assumption attorney fees would not be available in connection with a settlement. (*Ibid.*) And there was no reason for the government to have foreseen the subsequent statutory change. (*Id.* at p. 504.)

Indeed, California federal courts, applying federal law, have refused to apply the new version of section 218.5 at issue here to pending cases. (*Johnson v. Hewlett-Packard Co.* (N.D. Cal. Mar. 10, 2014, No. C 09-03596 CRB) 2014 WL 988824, at * 5–*6; *Johnson v. Hewlett-Packard Co.* (9th Cir. July 8, 2014, No. 11-17062) 2014 WL 5280490, at *1.)

While UPI, in defending the trial court's application of the older version of section 218.5, puts great reliance on *Martin*, the statute is, obviously, a California law, not a federal one. And while California courts generally apply the same framework as federal courts to retroactivity questions (*Myers v. Philip Morris Companies, Inc.* (2002) 28 Cal.4th 828, 841 [123 Cal.Rptr.2d 40, 50 P.3d 751]), it is for California courts, alone, to interpret California statutes, and thus to determine whether those statutes result in or should be given retroactive effect. (See *Butt v. State of California* (1992) 4 Cal.4th 668,

24

707 [15 Cal.Rptr.2d 480, 842 P.2d 1240] [United States Supreme Court opinion not binding on state law issue]; *People v. Guiton* (1993) 4 Cal.4th 1116, 1126 [17 Cal.Rptr.2d 365, 847 P.2d 45] [same]; *Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 760 [69 Cal.Rptr.3d 365] [declining to follow mistaken federal court construction of state statute].)

Our Supreme Court and the great majority of our lower appellate courts have viewed the question of retroactivity of fee and cost eligibility statutes differently than the federal courts. Fee and cost eligibility statutes, in the language of *Quarry*, are a "special category within the general topic of the prospective or retroactive application of statutes" subject to an "extensive line of authority." (*Quarry*, *supra*, 53 Cal.4th at p. 956 [noting limitations statutes are such a "special category"].)

This line commences with *Stockton Theatres, Inc. v. Palermo* (1956) 47 Cal.2d 469, 477 [304 P.2d 7] (*Palermo*). In *Palermo*, an appeal was taken and a surety bond posted in June 1951. Three months later, a statute took effect which allowed a prevailing party to recover as a litigation cost the premium on a surety bond. When the trial court ruled on costs in 1953, it denied recovery of the premium. The Supreme Court reversed and remanded, holding the new statute should have applied, even though the bond had been posted before the new statute took effect. A rule governing costs, even one already incurred, can, ruled the court, be changed during the pendency of a proceeding. (*Ibid.*)

Subsequently, in *Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 925 [154 Cal.Rptr.3d 503, 593 P.2d 200] (*Woodland Hills*), the high court ruled on the applicability of then newly enacted Code of Civil Procedure section 1021.5, authorizing fees for prevailing plaintiffs who enforce an important public right. Just months before the statute's effective date, the court, in *Serrano v. Priest* (1977) 20 Cal.3d 25 [141 Cal.Rptr. 315, 569 P.2d 1303], had recognized the courts' inherent equitable authority to award fees to a public interest litigant vindicating a constitutional right, but had expressly left undecided whether fees could similarly be granted for vindicating a

25

statutory right.  (*Id.* at pp. 924–925, 929.)  The issue in *Woodland Hills* was whether fees were recoverable under Code of Civil Procedure section 1021.5 in a "statutory" right case, even though the order denying fees had already been rendered and was pending on appeal when the new fee statute took effect.  (*Woodland Hills*, *supra*, at pp. 925–926, 929.)

*Woodland Hills* concluded the new fee statute was applicable.  "Although [Code of Civil Procedure] section 1021.5 was not on the books at the time the trial court denied plaintiffs' motion for attorney fees, the governing authorities establish that the new statute nonetheless applies to this proceeding, which was pending on appeal at the time the legislative enactment became effective."  (*Woodland Hills, supra*, 23 Cal.3d at p. 931.)  Among these governing authorities were *Bradley v. Richmond School Board* (1974) 416 U.S. 696 [94 S.Ct. 2006, 40 L.Ed.2d 476] (*Bradley*), a case applying a newly-enacted federal fee statute to a pending case.  The California Supreme Court viewed *Bradley* as "anchored . . . on the principle that a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary."  (*Woodland Hills,* at p. 931.)[6]

The *Woodland Hills* court also favorably cited two California Court of Appeal cases, *Olson v. Hickman* (1972) 25 Cal.App.3d 920 [102 Cal.Rptr. 248] (*Olson*) and *Kievlan v. Dahlberg Electronics* (1978) 78 Cal.App.3d 951 [144 Cal.Rptr. 585] (*Kievlan*).  *Olson* considered Government Code section 800, permitting an attorney fee award in challenges to "arbitrary or capricious" government agency actions.  (*Olson*,

---

[6] *Bradley* could have been read more narrowly—as holding that a new fee statute applies only when fees are already recoverable under another theory, such as when a statute codifies an existing equitable doctrine.  (See *Martin*, *supra*, 527 U.S. at pp. 359–360.)  Further, in *Bradley*, the United States Supreme Court recognized a distinct, non-statutory basis for fees, while the California Supreme Court in *Woodland Hills* expressly declined to consider whether there was any basis for awarding fees other than the new fee statute.  (*Bradley*, *supra*, 416 U.S. at pp. 720–721; *Woodland Hills*, *supra*, 23 Cal.3d at p. 930.)

*supra*, 25 Cal.App.3d at pp. 922–923.) The provision was enacted after briefing was complete on a challenger's merits appeal. After the challenger secured a reversal, but before the appellate decision became final, he asked the appellate court to award fees. (*Id.* at pp. 921–922.) The court did so, invoking the rule that a "lawsuit is governed by a change in procedural rules made during its pendency, and the suit is pending until its final determination on appeal." (*Id.* at p. 922.) *Kievlan* applied the same rationale—that the statute was a "procedural" rule—to Code of Civil Procedure section 1021.5, and thus held it applied to pending cases. (*Kievlan*, *supra*, 78 Cal.App.3d at p. 959.)

For decades, the courts of appeal have cited *Palermo*, *Woodland Hills*, or both, for the proposition that they "authoritatively held" that in the absence of express Legislative intent to the contrary, "a new statute authorizing an award of attorney fees" or a statute "increasing or decreasing litigation costs, including attorneys' fees" applies to actions pending at the time of enactment. (*California Housing Finance Agency v. E.R. Fairway Associates I* (1995) 37 Cal.App.4th 1508, 1512–1513 [44 Cal.Rptr.2d 591] [Health and Safety Code section 51205, amended during trial to provide for an award of attorney fees and costs to the prevailing party, applied.]; *American Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton* (2002) 96 Cal.App.4th 1017, 1056–1057 [117 Cal.Rptr.2d 685] [most recent version of Code of Civil Procedure section 998, amended during appeal, governed award of expert fees in case]; *Heritage Engineering Const., Inc. v. City of Industry* (1998) 65 Cal.App.4th 1435, 1439 [77 Cal.Rptr.2d 459] [applying the then-current version of Code of Civil Procedure section 998 to the case, which was pending on appeal when the 1997 amendment took effect]; *Mir v. Charter Suburban Hospital* (1994) 27 Cal.App.4th 1471, 1477–1478 [33 Cal.Rptr.2d 243] [Business and Professions Code section 809.9, which took effect after trial court judgment became final, allowed for award of fees incurred both before and after effective date of statute]; *ARA Living Centers-Pacific, Inc. v. Superior Court* (1993) 18 Cal.App.4th 1556, 1562 [23 Cal.Rptr.2d 224] [Welfare and Institutions Code section 15657, amended during trial

27

court proceedings to allow fees in elder abuse cases, applied]; *Wood v. McGovern* (1985) 167 Cal.App.3d 772, 774–776 [213 Cal.Rptr. 498] [Code of Civil Procedure section 1021.4, allowing fees against defendant who is convicted of a felony for the conduct giving rise to the civil suit, applies to suits pending when it became effective].)

In sum, the California Supreme Court and many, many courts of appeal have treated legislation affecting the recovery of costs, including attorney fees, as addressing a "procedural" matter that is "prospective" in character and thus not at odds with the general presumption against retroactivity.

Nevertheless, there is not total unanimity on this score. In *Andreini & Company v. MacCorkle Ins. Service, Inc*. (2013) 219 Cal.App.4th 1396 [62 Cal.Rptr.3d 555] (*Andreini*), the Court of Appeal considered an amendment to California Rules of Court, rule 8.278(d)(1)(G), allowing the recovery of " 'fees and net interest expenses incurred to borrow funds to provide security for [a] bond or to obtain a letter of credit.' " (*Andreini*, at p. 1405, italics omitted.) Focusing on the burden the amended rule would impose— "Andreini's liability for MacCorkle's costs would zoom from $6,553.12 to $221,324.52"—the court concluded it "would clearly qualify as ' " ' "new or different liabilit[y],' " ' " or a "substantial change" in legal consequences, as understood under general principles of retroactivity. (*Id.* at p. 1406.) However, *Andreini* does not acknowledge, let alone discuss, *Palermo* or *Woodland* or the line of appellate court cases following those decisions.[7]

---

[7] The same can be said of *City of Monte Sereno v. Padgett* (2007) 149 Cal.App.4th 1530, 1539–1540 [58 Cal.Rptr.3d 218], which declined to retroactively apply a city's new fee ordinance after the previous version was invalidated. *Miller v. Givens* (1994) 30 Cal.App.4th 18 [37 Cal.Rptr.2d 1] (*Miller*), which UPI cites as holding a fee statute should not be applied to award fees incurred *prior* to its enactment, actually considered an easier question: "The only question presented to us by the parties is whether an award for fees incurred *after* the effective date of the amendment constitutes a retroactive application." (*Id.* at p. 21, italics added.) *Miller* is therefore unhelpful. *Weinholz v. Kaiser Foundation Hospitals* (1989) 217 Cal.App.3d 1501, 1503–1507 [267 Cal.Rptr. 1] is also distinguishable. There, the Court of Appeal considered which

28

"Under the doctrine of *stare decisis*, all tribunals exercising inferior jurisdiction are required to follow decisions of courts exercising superior jurisdiction." (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Being bound by *Palermo* and *Woodland Hills*, we conclude the new version of section 218.5 provides the proper criteria for assessing fee entitlement in this case.

Accordingly, the order awarding attorney fees is reversed. Should UPI choose to pursue fees on remand, it shall be for the trial court to make the findings relevant to whether Case brought his cross-complaint in "bad faith." (§ 218.5, subd. (a); see, e.g., *Corbett v. Hayward Dodge, Inc.* (2004) 119 Cal.App.4th 915, 923–924 [14 Cal.Rptr.3d 741] [discussing what constitutes a plaintiff's bad faith prosecution under the similarly-worded CLRA[8] fee statute].)

## 2. *PAGA Does Not Apply*

Case argues reversal of the fee award can also be predicated on his prayer for relief in his cross-complaint for civil penalties under PAGA. His reasoning appears to be as follows: PAGA provides a one-way fee shifting statute, benefitting only prevailing employees. (§ 2699, subd. (g)(1).) Because he included a request for civil penalties in his prayer for relief, he properly advanced a PAGA claim. PAGA's fee statute should control over section 218.5, regardless of which version of the latter statute might otherwise apply to this case.

We do not agree, however, that Case properly pleaded a PAGA claim. His cross-complaint sets forth no separate PAGA cause of action, does not allege compliance with

---

version of contingency fee limits should control: those in place at the time the client entered the contingency fee agreement or those which took affect later during the litigation. The court applied the earlier version to protect the parties' contract expectations. It acknowledged *Woodland Hills*, but concluded it was applicable to statutory fees when there "was no possible contract impairment." (*Weinholz*, at p. 1507.) Here, *Woodland Hills* not *Weinholz*, is the applicable precedent.

[8] Consumer Legal Remedies Act (CLRA; Civ. Code, § 1750 et seq.).

or even reference PAGA's exhaustion requirements (§ 2699.3), does not specify which alleged Labor Code violations underlie the supposed PAGA claim, and to the extent it alleges a representative class action, does so under the traditional rubric of Code of Civil Procedure section 382. In fact, had Case pleaded a PAGA cause of action with such defects, it would have been subject to a demurrer or motion to strike. (See *Caliber Bodyworks, Inc. v. Superior Court* (2005) 134 Cal.App.4th 365, 382, 385 [36 Cal.Rptr.3d 31] (*Caliber Bodyworks*).) Moreover, plainly neither party viewed the cross-complaint as stating any such claim, since neither UPI's summary judgment papers nor Case's opposition ever mentioned PAGA or presented any evidence related to other employees' potential claims. It therefore is no surprise the trial court's summary judgment order does not reference PAGA either.

We therefore conclude the naked, one-line request in Case's prayer for relief for PAGA remedies does not constitute a PAGA claim that could even arguably make the PAGA fee statute applicable. (See *Caliber Bodyworks, supra*, 134 Cal.App.4th at p. 385 [ordering prayer for PAGA penalties struck when compliance with PAGA requirements not alleged].) Thus, we need not analyze Case's PAGA argument further.

## IV. DISPOSITION

The summary judgment in favor of UPI is affirmed. The order awarding UPI attorney fees is reversed and the matter remanded for the trial court to consider, if UPI makes a timely fee motion, UPI's entitlement to fees under the current version of section 218.5. The parties shall bear their own costs on these appeals.

30

_____

Banke, J.

We concur:


_____

Humes, P. J.


_____

Dondero, J.


A140457, *USS-Posco Industries v. Case*
A142145, *USS-Posco Industries v. Case*

Trial Court:                                         Contra Costa County Superior Court

Trial Judge:                                       Honorable Steven K. Austin

Greenan, Peffer, Sallander & Lally, Robert L. Sallander, Jr., Kyle G. Kunst; Cory Stephen Anderson for Respondent.

The Law Offices of Jon Webster, Jon Paul Webster and James A. Arcellana for Appellant.