**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| IN RE J.T. THORPE, INC.; THORPE INSULATION CO., *Debtors* | No. 15-56430 <br><br> D.C. No. 2:14-cv-03883-VAP |
| MICHAEL J. MANDELBROT; THE MANDELBROT LAW FIRM, *Appellants*, <br><br> v. <br><br> J.T. THORPE SETTLEMENT TRUST; THORPE INSULATION COMPANY ASBESTOS SETTLEMENT TRUST; CHARLES B. RENFREW, Administrative Law Judge, Futures Representative, *Appellees*. | OPINION |

Appeal from the United States District Court
for the Central District of California
Virginia A. Phillips, Chief District Judge, Presiding

Argued and Submitted February 17, 2017
Pasadena, California

Filed September 14, 2017

Before:  Milan D. Smith, Jr. and John B. Owens, Circuit
Judges, and Edward R. Korman,[*] District Judge.

Opinion by Judge John B. Owens;
Dissent by Judge Korman

**SUMMARY**[**]

**Bankruptcy**

The panel vacated the district court's affirmance of the
bankruptcy court's order enforcing a stipulated agreement in
adversary proceedings seeking to debar an attorney from
submitting claims to asbestos trusts, which are created
through the Chapter 11 bankruptcy proceedings of entities
exposed to significant asbestos liability.

The attorney had repudiated the settlement, arguing that
California Business and Professions Code section 16600 and
California Rule of Professional Conduct 1-500 rendered the
settlement illegal because it restrained him from the practice
of law.

The panel concluded that further proceedings in the
district court were warranted.  It remanded for the district
court to decide whether federal or state law governed,
including whether the asbestos trusts waived the argument

[*] The Honorable Edward R. Korman, United States District Judge
for the Eastern District of New York, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It
has been prepared by court staff for the convenience of the reader.

that federal law governed, and to decide the impact, if any, of *Golden v. Cal. Emergency Physicians Med. Grp.*, 782 F.3d 1073 (9th Cir. 2015), which held that California law requires a broad reading of section 16600.

Dissenting, District Judge Korman wrote that he would resolve the case on the merits and would affirm because the debarment provision was enforceable. Judge Korman wrote that the United States had a strong interest in enforcing the debarment provision, and, since it was reasonable, California had no interest in invalidating it.

## COUNSEL

Dirk Van Ausdall (argued), San Francisco, California; Michael J. Mandelbrot, The Mandelbrot Law Firm, Novato, California; for Appellants.

Gary S. Fergus (argued), Fergus Law Office, San Francisco, California; Daniel J. Bussel, Thomas E. Patterson, and Kathryn T. Zwicker, Klee Tuchin Bogdanoff & Stern LLP, Los Angeles, California: for Appellees.

**OPINION**

OWENS, Circuit Judge:

Michael Mandelbrot appeals from the district court's affirmance of an order that enforces a stipulated agreement between Mandelbrot and the J.T. Thorpe Settlement Trust. We have jurisdiction under 28 U.S.C. §§ 158 and 1334, and we vacate the district court's order and remand the case for further proceedings.

I. FACTUAL          BACKGROUND          AND
   PROCEDURAL HISTORY

Mandelbrot, an attorney, has represented asbestos claimants for many years. On behalf of his clients, he frequently submits claims to "asbestos trusts," which are created through the Chapter 11 bankruptcy reorganization of entities exposed to significant asbestos liability. *See generally* Lloyd Dixon et al., Rand Corp., Asbestos Bankruptcy Trusts (2010), *archived at* https://perma.cc/9AR8-289L. Subject to many requirements not relevant here, the Bankruptcy Code allows a Chapter 11 debtor to transfer its asbestos liabilities to a trust that it creates and funds (pursuant to state trust law) to pay asbestos claims. *See* 11 U.S.C. § 524(g)(2)(B)(i). The bankruptcy court retains jurisdiction to supervise the trust.

Trusts often compensate claimants through a streamlined procedure less clunky than traditional litigation. This system diverts fewer resources away from compensating claimants, which is generally a good thing. But because these nonadversarial procedures present the opportunity for untested chicanery, the trusts can take steps to debar a lawyer suspected of submitting bogus compensation claims.

Starting in 2011, the J.T. Thorpe, Thorpe Insulation, and Western Trusts ("Trusts") began investigating whether Mandelbrot had submitted bogus claims. To make a long story short, by May 2013, the Trusts had concluded that Mandelbrot was "unreliable," and that he had engaged in a pattern of submitting unreliable evidence. The Trusts eventually moved to debar Mandelbrot, and a January 2014 trial ensued.

After two days of trial testimony, the parties agreed to settle the case. Mandelbrot stipulated that the Trusts acted reasonably in (1) seeking to debar him, and (2) finding a pattern of him presenting unreliable evidence. He agreed to be permanently barred from submitting claims to the Trusts. In exchange, the Trusts agreed to (1) not seek damages from Mandelbrot, and (2) dismiss with prejudice their claims for equitable relief.

Just a few days later, Mandelbrot repudiated the settlement, and argued that California Business and Professions Code section 16600 and California Rule of Professional Conduct 1-500 rendered it illegal.[1] Without addressing section 16600 or Rule 1-500, the bankruptcy judge granted the Trusts' motion to enforce the settlement, and barred Mandelbrot from filing claims with the Trusts.

The district court affirmed that decision. It concluded that California law controls this issue, and that neither

---

[1] California Business and Professions Code section 16600 provides that "every contract by which anyone is restrained from engaging in a lawful profession . . . is to that extent void." California Rule of Professional Conduct 1-500(A) prohibits a California lawyer from being "a party to . . . an agreement, whether in connection with the settlement of a lawsuit or otherwise, if the agreement restricts the right of a member to practice law[.]"

section 16600 nor Rule 1-500 prohibits the settlement agreement. In its written opinion, the district court did not discuss *Golden v. California Emergency Physicians Medical Group*, 782 F.3d 1083 (9th Cir. 2015), which our court had decided a few months prior. The district court also did not analyze whether federal law controlled the case, as neither party had clearly argued its application.

## II.  DISCUSSION

### A.  *Standard of Review*

We review de novo a district court's judgment on appeal from the bankruptcy court. *Liquidating Tr. Comm. of the Del Biaggio Liquidating Tr. v. Freeman* (*In re Del Biaggio*), 834 F.3d 1003, 1007 (9th Cir. 2016). We review for an abuse of discretion the enforcement of a settlement agreement. *Callie v. Near*, 829 F.2d 888, 890 (9th Cir. 1987); *see also Golden*, 782 F.3d at 1089.

### B.  *Golden and Choice of Law*

In *Golden*, our court held that "[a]ssessing the validity of a settlement agreement . . . is a question of state contract law." 782 F.3d at 1087. Before the district court in the instant case, the parties disagreed whether Nevada or California law controlled the outcome of the case. If that were the choice before us, then the district court was undoubtedly correct to apply California law.

However, the Trusts vaguely suggest in the last two pages of their brief to our court (with little analysis or reasoning) that federal "public policy" prohibits the application of California law. That is usually not enough to preserve an argument. "[W]e will not ordinarily consider matters on appeal that are not specifically and distinctly

raised and argued in appellant's opening brief." *Int'l Union of Bricklayers & Allied Craftsmen Local Union No. 20 v. Martin Jaska, Inc.*, 752 F.2d 1401, 1404 (9th Cir. 1985); *see also Kopczynski v. The Jacqueline*, 742 F.2d 555, 560 (9th Cir. 1984) (claims of error on appeal "must be specific").

The district court never addressed whether federal law governs this case, and it is unclear whether the district court was even aware that the Trusts contended that federal law controlled its decision. This possible oversight is hardly the trial judge's fault, as the briefs filed in the district court also failed to squarely argue that federal law controls. Fundamental questions of law should appear at the beginning of a brief, not thrown in at the end, and should be clearly made. *See, e.g.*, *Arredondo v. Ortiz*, 365 F.3d 778, 781–82 (9th Cir. 2004) (holding that applicability of *Teague v. Lane*, 489 U.S. 288 (1989), should have been "the first issue" raised on appeal). Here, the district court easily could have concluded that the Trusts never made a federal choice-of-law argument. *See Gilchrist v. Jim Slemons Imps., Inc.*, 803 F.2d 1488, 1497 (9th Cir. 1986) (choice-of-law question is usually "waived unless it is timely raised").

The district court also did not apply *Golden* to the settlement at issue (the bankruptcy court issued its order before our court decided *Golden*). In *Golden*, our court examined whether section 16600 prohibited a settlement agreement that constrained a physician's freedom to practice medicine. 782 F.3d at 1086. After thoroughly reviewing the statutory language and relevant case law, the majority concluded that "[i]n determining a contract's validity under section 16600 . . . the court should direct its inquiry according to the actual statutory language: whether the challenged provision 'restrains anyone from engaging in a lawful profession, trade, or business of any kind.'" *Id*. at

1092 (internal citation and alteration omitted). The majority in *Golden* interpreted California law to require a broad reading of section 16600. *Id*. at 1090–92. Because the district court in the *Golden* case did not have the benefit of the majority opinion, our court remanded the case with its "relatively undeveloped record" so the district court could order additional briefing or conduct further fact-finding. *Id*. at 1093.

We believe the same approach is appropriate here. It may be, as the dissent suggests, that *Golden* has no application here because (1) federal law governs, or (2) the facts in this case differ materially from those in *Golden*. But neither party adequately argued to the district court that federal law governs (and have hardly argued it to this court), and the district court never addressed the impact of *Golden*. Consistent with *Golden*, these calls are best for the district court to make in the first instance. Accordingly, we vacate and remand this case so that the district court can decide whether federal or state law governs (including whether the federal law argument has been waived), and what impact, if any, *Golden* has on this case.

**VACATED and REMANDED.**

---

KORMAN, District Judge, dissenting:

In order to manage a nationwide glut of asbestos claims against bankrupt entities, Congress has authorized the creation of special asbestos bankruptcy trusts to pay settlements while balancing the interests of present and future claimants. After an extensive investigation, two asbestos trusts, each supervised by the Bankruptcy Court for the Central District of California—the J.T. Thorpe

Settlement Trust and the Thorpe Insulation Company Asbestos Settlement Trust (the "Thorpe Trusts")—accused appellant Michael Mandelbrot, a California lawyer, of "engag[ing] in a pattern and practice of filing unreliable evidence" in support of his clients' claims. To protect their assets from Mandelbrot's malfeasance, the trusts forbade him from filing any more claims, and asked the bankruptcy court to declare that decision reasonable.

At trial, after the Thorpe Trusts presented two full days of testimony against him, and with more yet to come, Mandelbrot agreed to a straightforward settlement: In exchange for an agreement not to sue for damages, he admitted that the Thorpe Trusts' finding that he was unreliable and had engaged in a pattern of unreliable filings was a reasonable one, and agreed to be permanently barred from submitting claims to those trusts and two others—the Western Asbestos Settlement Trust and the Plant Asbestos Settlement Trust—both of which also owe their existence to the federal asbestos-trust mechanism.

Only two days after that agreement halted his trial, however, Mandelbrot sought to back out of the deal. The bankruptcy court rejected Mandelbrot's attempt to renege, the district court affirmed, and Mandelbrot now appeals. The question presented is whether we should refuse to enforce an attorney's agreement not to practice before federally-supervised asbestos trusts because it purportedly violates California law. On the assumption that California law applies, the validity of the agreement turns on California Business and Professions Code § 16600, which provides that "every contract by which anyone is restrained from engaging in a lawful profession . . . is to that extent void." More specifically, because the settlement agreement arises out of Mandelbrot's unethical behavior and bars him from

submitting claims to only four asbestos trusts, the agreement's validity turns on the effect of our construction of the breadth of § 16600 in *Golden v. Cal. Emergency Physicians Med. Grp.*, 782 F.3d 1083, 1089–93 (9th Cir. 2015).

The majority remands the case to the district court to consider that issue, one that was fully briefed here, because of the unfounded assumption that the district court did not consider *Golden* in its opinion upholding the settlement agreement. While California law does not apply here, for reasons developed below, the opinion of the district court and the chronology of the briefing there, which go without mention in the majority opinion, undermines the suggestion that "the district court never addressed the impact of *Golden*." Specifically, the record shows that *Golden* was decided on April 8, 2015, when Mandelbrot's appeal from the bankruptcy court was pending before the district court. On May 27, 2015, the Thorpe Trusts filed a Notice of Supplemental Authority ("NSA"), calling the district court's attention to *Golden*. This submission, which included a copy of *Golden*, thoroughly argued that, "although the *Golden* decision does interpret section 16600, it does not lend any support for Mandelbrot's appeal." Subsequently, on June 9, 2015, the Thorpe Trusts filed another NSA advising the district court that the Ninth Circuit had summarily denied defendant's petition for rehearing en banc and certification to the Supreme Court of California.

Mandelbrot did not contest the argument of the Thorpe Trusts that *Golden* did not lend any support for his then-pending appeal from the order of the bankruptcy court. Mandelbrot did not even file any submission in response, thus conceding the argument of the Thorpe Trusts that *Golden* did not affect the validity of the settlement

agreement. Under these circumstances, the district court judge had no need to expressly address *Golden* in her exhaustive and thoughtful opinion. Indeed, the district judge said more than enough when she correctly wrote that Mandelbrot "cite[d] no case where a court has applied § 16600 to void a settlement in proceedings alleging submission of unreliable claim evidence." *In re: J.T. Thorpe, Inc. & Thorpe Insulation Co.*, 2015 WL 5167923, at \*5 (C.D. Cal. Sept. 3, 2015).

Mandelbrot is not entitled to a second bite at the apple in the district court—a bite that will cause the trusts to expend funds otherwise dedicated to those suffering from asbestos exposure and those who may suffer from it in the future. Nor does the remand here find any support from the fact that the panel in *Golden* "remanded the case with its 'relatively undeveloped record' so the district court could order additional briefing or conduct further factfinding." Unlike the district court record in *Golden*, the record here is fully developed and includes findings of fact by the district court, another fact that the majority opinion ignores.

This is not a close case on the merits. There is no reason for the majority to kick the can down the road, not only with respect to the applicability of *Golden* but also to the issue whether the Thorpe Trusts "adequately argued to the district court that federal law governs." The record shows that even Mandelbrot understood the contention of the Thorpe Trusts "that Nevada or federal law should . . . be applied." While the Thorpe Trusts's argument, which was made in identical language here and in the district court, could have been better, we have refused to find an argument waived even where we agreed with the appellee that the appellant's argument was "indeed minimal." *California State Legislative Bd. v. Mineta*, 328 F.3d 605, 608 n.6 (9th Cir.

2003). Nor does the majority hold that the argument was waived here. Instead, it remands to the district court to decide whether federal or state law governs, including whether the federal law argument has been waived. But regardless of the nature of any procedural default in the district court, whether by failing to raise an issue or by raising it ineptly, we may consider an issue raised for the first time on appeal "when the issue is purely one of law and the necessary facts are fully developed." *Romain v. Shear*, 799 F.2d 1416, 1419 (9th Cir. 1986). Because this exception to the rule that we will "generally not consider an issue raised for the first time on appeal," *id.*, applies here, a remand to determine whether federal law applies is no more necessary than the remand to the district court to discuss the effect of *Golden*.

"At a time where the resources of . . . this Circuit especially, are strained to the breaking point," *Doi v. Halekulani Corp.*, 276 F.3d 1131, 1141 (9th Cir. 2002), we do not enjoy the luxury of a game of ping pong with the district court, especially in a case where a party seeks to wriggle out of a settlement agreement made two days into a trial that was not going his way. I would resolve this case on the merits, as set forth below.

**BACKGROUND**

*A.  Asbestos Bankruptcy Trusts & Debarment*

The appellees in this case—the J.T. Thorpe Settlement Trust, and the Thorpe Insulation Company Asbestos Settlement Trust—are asbestos bankruptcy trusts (just "asbestos trusts" from here on out). The third appellee, Charles Renfrew, is the "futures representative" of the two appellee trusts, a fiduciary charged with representing the

interests of future claimants. He has joined without reservation in the briefs submitted by the trusts.

Asbestos trusts are created through the Chapter 11 reorganization of entities exposed to significant asbestos liability. *See generally* Lloyd Dixon et al., RAND Corp., Asbestos Bankruptcy Trusts (2010), *archived at* https://perma.cc/9AR8-289L. Subject to many requirements not relevant here, section 524(g) of the Bankruptcy Code allows a Chapter 11 debtor to transfer its asbestos liabilities to a trust that it creates and funds for the purpose of paying asbestos claims. *See* 11 U.S.C. § 524(g)(2)(B)(i). Although asbestos trusts arise in the course of federal bankruptcy proceedings, they are formally created under state trust law. The J.T. Thorpe and Thorpe Insulation plans of reorganization followed the standard practice of the bankruptcy court retaining jurisdiction to supervise the administration of the trust.

This case starts with the Thorpe Trusts' barring Mandelbrot from presenting evidence on behalf of his clients, a remedy—for the sake of convenience, I call it "debarment"—that helps asbestos trusts protect themselves from paying out on bad claims. The Thorpe Trusts, like most asbestos trusts, process claims primarily through relatively informal, non-adversarial procedures. *See generally* U.S. Government Accountability Office, Asbestos Injury Compensation: The Role and Administration of Asbestos Trusts 17–23 (2011), *archived at* https://perma.cc/449K-TWPT. As the Case Valuation Matrix for each of the Thorpe Trusts explains, claimants must submit evidence that is "reliable and credible," but the trusts will "not strictly apply rules of evidence." Rather than subject claimants and the trusts to the expense of adversarial litigation, the Thorpe Trusts' procedures provide for claimants to submit evidence

and for the relevant trust to evaluate it. To the extent the claimant shows exposure to the debtor's asbestos and compensable harm, the trust offers a settlement. A claimant may reject the offer and start adversarial proceedings, but only after the ordinary claims process runs its course.

As the Thorpe Trusts explain, these streamlined procedures were selected because, being relatively less costly than adversarial ones, they divert fewer resources away from compensating claimants. But administrative convenience has a price: the trusts risk paying out on unfounded or even fraudulent claims that adversarial proceedings would have weeded out. To help manage that risk, the Thorpe Trusts' Trust Distribution Procedures ("TDPs") expressly authorize a variety of remedies in cases where a trust finds that unreliable or fraudulent evidence has been submitted on a claimant's behalf.

Debarment is one such remedy. It is authorized, in identical terms, by language located at section 5.7(a) of both the J.T. Thorpe and Thorpe Insulation TDPs, providing in relevant part that:

> "In the event that the Trust reasonably determines that any unreliable individual or entity has engaged in a pattern or practice of providing unreliable medical or other evidence to the Trust, it may decline to accept additional evidence from such provider in the future. Further, in the event that an audit reveals that fraudulent information has been provided to the Trust, the Trust may penalize any responsible . . . claimant's attorney by . . . means including, but not limited to, requiring the . . . attorney submitting the fraudulent information to pay the costs

> associated with the audit . . . , raising the level of scrutiny of additional information submitted . . . , refusing to accept additional evidence from the [attorney], seeking the prosecution of the . . . attorney for presenting a fraudulent claim in violation of 18 U.S.C. § 152 [prohibiting fraud committed in relation to bankruptcy proceedings], and seeking Rule 11 sanctions."

Debarment is non-judicial: It can be imposed by the trust itself, on its own authority, without any prior judicial review, so long as the trust "reasonably" makes the predicate findings. Nevertheless, the reference to the possibility of federal criminal prosecution and Rule 11 sanctions underscores the fact that the submission of claims to asbestos trusts, from which Mandelbrot has been debarred, is part of the practice of law in the bankruptcy court.

## B.  Factual Background & Proceedings Below

For over 20 years, Mandelbrot has represented asbestos claimants before trusts created in the course of federal Chapter 11 proceedings. As of 2013, he had submitted more than 13,000 claims to asbestos trusts nationwide. In the fall of 2011, the Thorpe Trusts—along with another, the Western Asbestos Settlement Trust—began investigating some of those claims.

Each of the Thorpe Trusts, as well as the Western Trust, are distinct entities. To reduce overhead, however, the trusts share certain administrative resources—both of the Thorpe Trusts have contracted out their claims administration function to the Western Trust. In other words, the trusts maintain separate pools of money for compensation, but share a facility for administering claims against those funds.

Claims are asserted against individual trusts, and then—for administrative purposes only—processed by the Western Trust's staff. Debarring Mandelbrot from the Thorpe Trusts means that he cannot file claims for compensation out of Thorpe Trust *funds*, but relieves the Western Trust of the *administrative* burdens associated with processing those claims.

The three trusts essentially undertook a single joint investigation, which concluded, in May of 2013, with a letter to Mandelbrot finding that he was "unreliable," and that, with respect to the Thorpe Trusts, he had engaged in a pattern of submitting unreliable evidence. The trusts also noted the existence of "substantial information to support a conclusion" that Mandelbrot had intentionally falsified evidence, but did not actually "make such a determination."

As a result of their findings, the Thorpe Trusts (but *not* the Western Trust) debarred Mandelbrot. They determined that they would "accept no further evidence or claims from [him]," but offered to suspend that bar if Mandelbrot submitted his clients' claims to extra scrutiny during a two-year probationary period. Mandelbrot did not take them up on their offer, and in August of 2013, the Thorpe Trusts jointly moved the bankruptcy court for instructions (essentially a declaratory judgment) that their decision to debar Mandelbrot was "authorized under the TDPs of each Trust, and reasonable in light of the Trusts' audit and investigative findings."

Mandelbrot opposed the motion, and the parties convened for trial in January of 2014. After the trusts had put on two full days of testimony, the parties reached an agreement to settle the case. As part of the settlement, Mandelbrot made a detailed series of stipulations in open court. First, he stipulated that the Thorpe Trusts had acted

reasonably in debarring him, in light of their investigative findings. Second, Mandelbrot agreed that all of the post-investigation conclusions of the Thorpe Trusts and the Western Trust, as communicated to him in the May 2013 letter, were reasonable in light of the evidence that the investigation had collected. That stipulation expressly included Mandelbrot's agreement that the Thorpe Trusts had reasonably found the factual predicates for debarring him—that he is unreliable and had "engaged in a pattern and practice of filing unreliable evidence." Third and finally, Mandelbrot stipulated to be bound by a *permanent bar* on submitting claims to four separate asbestos trusts: the two Thorpe Trusts, the Western Trust, and a fourth—the Plant Asbestos Settlement Trust.

While the latter two trusts were not parties to the underlying litigation, they were parties to the stipulated agreement. More significantly, they were hardly strangers to the risks posed by Mandelbrot's conduct: The Western Trust found that it was the victim of Mandelbrot's submission of unreliable evidence. Although it did not find that Mandelbrot's claims "clearly reflect[ed] a pattern or practice of unreliability," it intended (prior to the settlement) to "continue to closely monitor the evidentiary submissions of Mandelbrot." Letter of Managing Trustee Stephen M. Snyder, on behalf of the Thorpe and Western Trusts, to Michael Mandelbrot (May 24, 2013), at 3 n.4 (available at Case No. 2:12-ap-02182, Dkt. No. 132 Ex. A, (Bankr. C.D. Cal.)).The Plant Trust was not yet accepting claims at the time the other three trusts investigated Mandelbrot, although it, the Thorpe Trusts, and the Western Trust had the same Trustees, the same Futures Representative, and significantly overlapping membership between their Trust Advisory

Committees.[1] These fiduciaries, whose obligations to the Western and Plant Trusts stand on equal footing with their duties to the Thorpe Trusts, were obviously aware of the unethical behavior in which Mandelbrot had engaged, and to which they had good reason not to subject themselves if they could avoid doing so.

In exchange for Mandelbrot's agreement to be debarred, the Thorpe Trusts and the Western Trust agreed that they would not seek to recover any money from Mandelbrot.[2] Relying on Mandelbrot's stipulations, the bankruptcy judge stated that she "would approve such an arrangement," which she described as "appropriate on the facts and circumstances of this case." The parties departed on the understanding that they would memorialize the settlement in a final written agreement.

Mandelbrot did not hold up his end of the deal—he repudiated the settlement within days. The Thorpe Trusts filed a motion to enforce the agreement, which Mandelbrot opposed on the grounds that his agreement not to practice before the four trusts (the "debarment provision") was illegal under California Business and Professions Code § 16600— which provides that "every contract by which anyone is

---

[1] *See* J.T. Thorpe Settlement Trust, Trust Representatives, *archived at* https://perma.cc/FFH2-HGSC; Thorpe Insulation Settlement Trust, Trust Representatives, *archived at* https://perma.cc/6273-Q7HM; Western Asbestos Settlement Trust, Trust Representatives, *archived at* https://perma.cc/D86F-LRPQ; Plant Asbestos Settlement Trust, Trust Representatives, *archived at* https://perma.cc/4344-EW96.

[2] The Plant Trust did not make such an agreement, because when the parties entered into the settlement in early 2014, the Plant Trust had not begun accepting claims.

restrained from engaging in a lawful profession . . . is to that extent void"—and California Rule of Professional Conduct 1-500—which prohibits a California lawyer from being "a party to . . . an agreement, whether in connection with the settlement of a lawsuit or otherwise, if the agreement restricts the right . . . to practice law."

The bankruptcy judge granted the Thorpe Trusts' motion to enforce the settlement, and entered an order permanently barring Mandelbrot from filing claims with the Thorpe Trusts, the Western Trust, or the Plant Trust. The bankruptcy judge said that she had found the Thorpe Trusts' conclusion that Mandelbrot had submitted unreliable claims to be reasonable "in response to the parties' joint request," but "would have found" the same "based on the evidence submitted" at trial. The judge then went on to hold that the debarment provision did not prohibit Mandelbrot from practicing law, only from practicing before trusts that had justifiably deemed him untrustworthy, and that he did not "have a license to engage in improper conduct or fraudulent behavior."

Mandelbrot appealed, and the district judge affirmed in a written order. *See In re J.T. Thorpe, Inc. & Thorpe Insulation Co.*, 2015 WL 5167923 (C.D. Cal. 2015). Respecting California Business & Professions Code § 16600, the district judge held that it protects interests— "lawyers' freedom of employment and competition"—that "have nothing to do with this case." *Id.* at *5. Moreover, the judge recognized the existence of an important countervailing interest—asbestos trusts' need to "protect[] their beneficiaries from a lawyer they find to be unreliable." *Id.* The district court concluded that harming the trusts' ability to vindicate that interest "on the ground that refusing

to deal with [Mandelbrot] would harm his practice" would serve "no public policy purpose." *Id.*

The district judge likewise found that refusing to enforce the debarment provision would not advance the policies underlying California Rule of Professional Conduct 1-500. In the district judge's opinion, "[t]he [debarment provision] does not deny the public access to a lawyer who prevailed against the defendant in a prior action. Instead, it protects the public from one who submitted unreliable evidence that led to further scrutiny, audits, and expense. [There is] no basis for applying Rule 1-500 to bar [asbestos] trusts from stipulating to the imposition of the remedies authorized by their TDPs to safeguard claimants from an attorney that the trusts find to be unreliable, as opposed to forcing the trusts to litigate the matter in the face of powerful evidence to its obvious conclusion." *Id.* at *6. Mandelbrot filed a timely notice of appeal from the district court's decision.

## DISCUSSION

A district court's judgment on appeal from the bankruptcy court is reviewed de novo—we stand in the shoes of the district court, and as a practical matter review the bankruptcy court's judgment. *Liquidating Trust Committee of the Del Biaggio Liquidating Trust v. Freeman (In re Del Biaggio)*, 834 F.3d 1003, 1007 (9th Cir. 2016). Enforcement of a settlement agreement is an equitable remedy, *Callie v. Near*, 829 F.2d 888, 890 (9th Cir. 1987), reviewed for abuse of discretion, *Golden v. Cal. Emergency Physicians Med. Grp.*, 782 F.3d 1083, 1089 (9th Cir. 2015). The ultimate question in this appeal is whether or not the debarment provision is valid and enforceable—to the extent Mandelbrot tries to get out from under any other provision of the settlement agreement, his only argument is that the

debarment provision is void and the remainder of the deal non-severable.

Mandelbrot argues that California law applies because the agreement was made in, and will largely be performed in, California. California law embodies a strong public policy against restricting professional practice, and Mandelbrot argues that under California Business & Professions Code § 16600, as well as California Rule of Professional Conduct 1-500, the settlement agreement is void. The Thorpe Trusts contend that the issue is governed by either Nevada law—because they are domiciled in that state and constituted under its law of trusts—or federal law—because the trusts were brought forth and continue to operate pursuant to a federally-supervised plan of reorganization. The trusts' ultimate position, however, is that Mandelbrot's agreement to be debarred is enforceable regardless of which law applies. I agree that the debarment provision is enforceable. There is a significant federal interest in its enforceability as a means to protect both the assets of congressionally-authorized asbestos trusts, and the integrity of bankruptcy court proceedings. Moreover, I am not persuaded that, even in their own courts, either California or Nevada would refuse to enforce the debarment provision. Indeed, I see no interest that either state could conceivably have in doing so.

## I.   Background Principles

Courts often apply state law to resolve cases touching federal interests. In fact, in this context we begin with a default presumption that "the interstices of federal remedial schemes" like the asbestos-trust mechanism should be filled in with incorporated state-law rules of decision. *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 98 (1991). Nevertheless, we will push state law aside when a

"significant conflict exists between an identifiable federal policy or interest and the operation of state law, or the application of state law would frustrate specific objectives of federal legislation." *U.S. Postal Service v. Ester*, 836 F.3d 1189, 1195 (9th Cir. 2016) (M. Smith, J.) (quoting *Boyle v. United Techs. Corp*, 487 U.S. 500, 507 (1988)). We do not rule "in general terms" on the compatibility of whole bodies of law, but on whether "specific . . . state rules . . . provide appropriate standards for federal [policy]." *See United States v. Little Lake Misere Land Co., Inc.*, 412 U.S. 580, 595–96 (1973). That focus does not blind us, however, to the sensitivities of interstitial lawmaking in a federal system. The strong medicine of the Supremacy Clause notwithstanding, "our cases have primarily focused on the issue of *competing* federal and state concerns," and applied an interest-balancing approach. *See Dupnik v. United States*, 848 F.2d 1476, 1481 (9th Cir. 1988) (emphasis added) (internal quotation marks omitted).

This general approach is equally applicable in the context of settlement agreements. We have held that settlement agreements are "[*t*]*ypically* . . . governed by" state law. *Golden v. Cal. Emergency Physicians Med. Grp.*, 782 F.3d 1083, 1087 (9th Cir. 2015) (quoting *O'Neil v. Bunge Corp.*, 365 F.3d 820, 822 (9th Cir. 2004)) (emphasis added). But this is an atypical case because "clear and substantial interests of the National Government . . . will suffer major damage if the state law is applied." *Dupnik*, 848 F.2d at 1481 (quoting *United States v. Yazell*, 382 U.S. 341, 352 (1966)). Indeed, under *any* set of modern choice-of-law principles, which law governs a contract will always depend on the particular subject matter of the agreement, and on the

interests reflected by the laws that are presumably in conflict.[3]

## II. Practice Before Asbestos Trusts is an Area of Unique Federal Interest

The United States has a compelling interest in enforcing the debarment provision, because refusing to do so would affect the intended function of entities that Congress has designated to play a starring role in carrying out federal policy. The Supreme Court has long held that certain fields of activity, while not totally beyond the reach of state law, involve "uniquely federal interests," *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988), in "matters necessarily subject to federal control even in the absence of statutory authority," *Tx. Indus. v. Radcliff Materials, Inc.*, 451 U.S. 630, 642 (1981). In such areas, federal courts may decline to give effect to otherwise applicable state law in order to protect the federal interest from harm. *See U.S. Postal Service v. Ester*, 836 F.3d 1189, 1195 (9th Cir. 2016) (quoting *Boyle*, 487 U.S. at 507); *cf. Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 382 (1995) (holding,

---

[3] Consider the Second Restatement of Conflict of Laws, which we look to in federal-question cases as a source of general choice-of-law principles to the extent we conclude they are persuasive. *See, e.g.*, *PNC Bank v. Sterba* (*In re Sterba*), 852 F.3d 1175, 1179 (9th Cir. 2017). As the comment to Section 200 of the Second Restatement explains, the critical questions in choosing the law to govern the validity of a contract are 1) which state has a "substantial relationship" to the subject matter of, and parties to, the agreement, and 2) which state has a "materially greater interest" in seeing its law applied. *See* Restatement (Second) of Conflict of Laws § 200 cmt. c. California's own governmental-interest approach takes essentially the same view. *See McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68, 87–88 (2010). While these principles do not speak to federal-state conflicts of law, this general framework applies equally well here.

in a diversity case, that "enforcement of the settlement agreement is for state courts, *unless there is some independent basis for federal jurisdiction*") (emphasis added).

Bankruptcy is undoubtedly such an area. "The Constitution grants Congress exclusive power to regulate bankruptcy," *Kalb v. Feuerstein*, 308 U.S. 433, 440 (1940), and Congress has used that power here to set up a particular mechanism for resolving the asbestos liabilities of debtors facing billions of dollars in potential claims. The fact that it has elected to place responsibility for operating that mechanism largely in the private (albeit court-supervised) hands of asbestos trusts does not make the field any less intrinsically federal. Asbestos trusts are fundamentally tools for doing the basic jobs of bankruptcy—"reliev[ing] the debtor[s] of the uncertainty of future asbestos liabilities" so as to preserve their economic viability, *see In re Combustion Engineering, Inc.*, 391 F.3d 190, 234 (3d Cir. 2004), and adjusting the claims of potential tort creditors, *see Jeld-Wen, Inc. v. Van Brunt* (*In re Grossman's Inc.*), 607 F.3d 114, 126–27 (3d Cir. 2010) (en banc).

It is obvious on the face of their authorizing statute—11 U.S.C. § 524(g)—that one of Congress's primary designs in sanctioning the operation of asbestos trusts was to ensure that funds allocated to pay asbestos claimants would be managed so as to leave each trust "in a financial position to pay . . . present claims and future demands . . . in substantially the same manner" as it waited decades for the last of its potential beneficiaries to wait out their lives and latency periods. 11 U.S.C. § 524(g)(2)(B)(ii)(V). In the same vein, Congress required that for the trust arrangement to bind future claimants at all, the bankruptcy court must determine

that doing so would be "fair and equitable" to that class in light of the benefits to the debtor. *Id.* § 524(g)(4)(B)(ii).

The design of the trust system to protect future claimants was a deliberate one that, as the Third Circuit has explained, may have been in some respects constitutionally mandatory. "By enacting § 524(g), Congress took account of the due process implications of discharging future claims of individuals whose injuries were not manifest at the time of the bankruptcy petition. . . . Many of the requirements in § 524(g) are specifically tailored to protect the due process rights of future claimants." *Jeld-Wen*, 607 F.3d at 127 (internal modifications and quotation marks omitted). The history of § 524(g)'s enactment paints the same picture: The asbestos trust system is concerned primarily with the long-term protection of assets for future claimants. As the House Judiciary Committee's report on the trust mechanism characterized it, the new procedure would involve "the establishment of a trust *to pay the future claims*," a solution the Committee described as meant "to help protect" those unknown creditors who would not emerge for "up to 30 years or more" because of their disease's "long latency period," and in the meantime would have no opportunity to participate in the bankruptcy proceedings. H.R. Rep. No. 103-835, at 40–41 (emphasis added) (discussing § 111 of H.R. 5116, enacted as 11 U.S.C. § 524(g) by the Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, 108 Stat. 4106 (1994)). This explains Charles Renfrew's participation in this case as the representative of those future claimants' interests.

Summed up, federal law in this area expresses a clear policy—asbestos trusts exist to protect future claimants, and each trust must be structured so they are duty-bound to conserve their assets on behalf of those unknown

beneficiaries. The federal interest in the viability of that mechanism is significant. As the three trusts warned Mandelbrot, fraud in connection with federal bankruptcy proceedings is a federal crime, *see* 18 U.S.C. § 152, a penalty "enacted to serve important *interests of government*, not merely to protect individuals who might be harmed by the prohibited conduct." *Stegeman v. United States*, 425 F.2d 984, 986 (9th Cir. 1970) (emphasis added). Entering into a consensual agreement to debar a lawyer who admits to a record of misleading submissions is a clear example of an asbestos trust acting so as to effectuate that congressionally-appointed obligation. State law should not be permitted to interpose itself between an asbestos trust and what amounts to the execution of a federal policy simply because it may come within the rubric of a restriction on the practice of law.

To hold otherwise would not only threaten the interests inherent in the § 524(g) trust mechanism, but would flatly overrule *Winterrowd v. American General Annuity Insurance Co.*, 556 F.3d 815 (9th Cir. 2009) (M. Smith, J.). *Winterrowd* involved a petition for attorney's fees for work done, in a federal district court located in California, by a lawyer admitted to practice only in Oregon. The right to attorney's fees arose out of California's substantive law, and the district court denied an award of fees for the Oregon lawyer's work on the basis that, under the California Supreme Court's decision in *Birbrower, Montalbano, Condon & Frank, P.C. v. Superior Court of Santa Clara County*, 17 Cal. 4th 119 (1998), his work constituted the unauthorized practice of law in California. *See Winterrowd*, 556 F.3d at 820.

*Winterrowd* rejected that argument. As the majority opinion in that case held:

"Admissions rules and procedure for federal
court are independent of those that govern
admission to practice in state courts. *In re
Poole*, 222 F.3d 618, 620–22 (9th Cir. 2000)
('[A]s nearly a century of Supreme Court
precedent makes clear, practice before
federal courts is not governed by state-court
rules.'); *see also Birbrower*, 17 Cal. 4th at
130 ('The [State Bar] Act does not regulate
practice before United States courts.'). This
is true even 'when admission to a federal
court is predicated upon admission to the bar
of the state court of last resort. *In re Poole*,
222 F.3d at 620. . . . Since all litigation in this
case took place in federal court, *Birbrower* is
inapposite.        The       district      court
'inappropriate[ly] reli[ed] on state authority
to impose federal discipline' . . . . *In re Poole*,
222 F.3d at 622."

*Winterrowd*, 556 F.3d at 820. The ultimate question in the
present case is the same one as in *Winterrowd*—in our
federal system, who has the power to regulate practice in
federal court? The answer is the same as well: federal law.

   Asbestos trusts' power to set and enforce ethical
standards for the lawyers who practice before them implicate
that principle in two important ways. First and most
obviously, every asbestos trust is created by order of a
federal court in the course of federal bankruptcy
proceedings, and acts—for every practical purpose—as an
arm of that court, allocating money out of a limited
compensation fund according to parameters laid down by
court order. In that sense, asbestos trusts function much as
special masters sometimes do in other kinds of mass tort

proceedings. *See, e.g.*, *In re Holocaust Victim Assets Litigation*, 424 F.3d 132, 137 (2d Cir. 2005); *see also* Fed. R. Civ. P. 53(c)(1)(A) (giving court-appointed masters the power to "regulate all proceedings" before them).**[4]**

To file a claim with an asbestos trust, then, is functionally to participate in a federal judicial proceeding, regulated by the trust's court-approved TDPs, by Rule 11, by the threat of criminal sanction under 18 U.S.C. § 152, and—where necessary—by "the inherent power of the federal court[] . . . to discipline attorneys who appear before it." *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991). Declining to enforce asbestos trusts' debarment agreements, which fundamentally sound in attorney discipline, solely because they would violate a state's policy regulating the practice of law in that state, would run counter to the basic principle that "[a]dmission to practice law before a state's courts and admission to practice before the federal courts . . .

---

**[4]** The *Holocaust Victim Assets Litigation* itself involved an even more pertinent example of a claims-resolution mechanism that, while federally supervised, was technically constituted under a different body of law. That case involved claims to recover assets that, at the time of the Holocaust, were owned by victims of Nazi persecution and deposited with Swiss banks. As part of a settlement agreement, the Swiss banking industry and the Swiss government created a body called the Claims Resolution Tribunal (CRT) to arbitrate claims on those assets. With respect to its federal *raison d'etre*—resolving claims that were the subject of litigation in federal court—the CRT functioned according to criteria approved by the district judge, and operated under his supervision. *See In re Holocaust Victim Assets Litigation*, 105 F. Supp. 2d 139, 154 (E.D.N.Y. 2000). In all other respects, however, the CRT remained "an Association [Ger: *Verein*] established under Swiss law," and operated under the ordinary Swiss legal rules applicable to any other similarly-situated entity. *See* CLAIMS RESOLUTION TRIBUNAL, RULES GOVERNING THE CLAIMS RESOLUTION PROCESS (AS AMENDED) 4, *archived at* https://perma.cc/3DKC-7GAU.

are separate, independent privileges," "even when admission to a federal court is predicated upon admission" to a state bar. *Brown v. Smith* (*In re Poole*), 222 F.3d 618, 620 (9th Cir. 2000). A lawyer simply may not "waste . . . [a federal] court's time and resources with cantankerous conduct, even in the unlikely event a state court would allow him to do so." *Chambers*, 501 U.S. at 53 (quoting *NASCO, Inc. v. Calcasieu Television & Radio, Inc.*, 894 F.2d 696, 706 (5th Cir. 1990)).

Moreover, even if there were no direct relationship between asbestos trusts and the federal judiciary, the same basic principle would control. Asbestos trusts act as adjudicators carrying out federal policy, and the privilege of practice before federal tribunals, including nonjudicial ones, has always been subject to exclusive federal control. "A State may not enforce licensing requirements which, though valid in the absence of federal regulation, give the State[] . . . a virtual power of review over [a federal agency's] determination that a person . . . is qualified . . . to perform certain functions." *Sperry v. Florida ex rel. Florida Bar*, 373 U.S. 379, 385 (1963) (internal quotation marks omitted) (holding that Florida's prohibition on the unauthorized practice of law could not be enforced against a non-lawyer who represented clients before the U.S. Patent and Trademark Office in conformity with the federal agency's rules). As the Federal Circuit has succinctly stated, "any state or local law which attempts to impede or control the federal government or its instrumentalities is deemed presumptively invalid . . . . So too state licensing requirements which purport to regulate private individuals who appear before a federal agency are invalid." *Augustine v. Dep't of Veterans Affairs*, 429 F.3d 1334, 1339–40 (Fed. Cir. 2005). This is the key to whether California has any interest in applying its law to the agreement in this case.

Where California has no power to act, no rational analysis could ascribe to it an interest greater than the one the United States possesses in assuring the integrity of practice before asbestos trusts that are both court-supervised and congressionally-sanctioned.

In determining the *scope* of asbestos trusts' protection from state interference, we look to that long afforded national banks. "Federally chartered banks are subject to state laws of general application in their daily business" only "to the extent such laws do not conflict with the . . . purposes of the [National Bank Act]." *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 11 (2007). When state law interferes with the "purposes" of national banks, however, or "tend[s] to impair . . . their efficiency as federal agencies," it must give way to the federal interest in their unmolested operation. *First Nat'l Bank in St. Louis v. Missouri*, 263 U.S. 640, 656 (1924). This sort of limited, contextual, displacement is a well-established mechanism for balancing the need to protect federal interests against the convenience and comity of applying a readymade body of state law. *See also Mortensen v. Bresnan Comms., LLC*, 722 F.3d 1151, 1159 (9th Cir. 2013) (explaining that under the Federal Arbitration Act, agreements to arbitrate are generally governed by state law, except in those particular circumstances where state contract rules work, as a practical matter, to disfavor arbitration).

## III.    California Has No Interest in Refusing to Enforce the Debarment Provision

Even if California had some power to act here, it would still have no genuine interest in invalidating Mandelbrot's agreement to be debarred. Indeed, it is hardly clear that California law would actually do so. Mandelbrot argues that California's interest in applying its law to this case arises out

of California Business & Professions Code § 16600 and California Rule of Professional Conduct 1-500. The parties address the two separately, but they should be addressed together because the Rules of Professional Conduct necessarily affect how § 16600, which applies in many contexts, speaks to the legal profession in particular. I begin with a brief overview of those provisions.

Section 16600 of California's Business & Professions Code provides that, except for a handful of narrow exceptions not applicable here, "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." The California courts have spoken clearly about the policies underlying § 16600—the point of the statute is to "favor . . . open competition and employee mobility." *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th. 937, 946 (2008). California Rule of Professional Conduct 1-500 enacts a similar policy, only specific to the practice of law: It provides (also with exceptions not relevant here), that an attorney "shall not be a party to . . . an agreement, whether in connection with the settlement of a lawsuit or otherwise, if the agreement restricts the right of a member [of the State Bar of California] to practice law." Rule 1-500 protects "the autonomy of attorneys and the ability of clients to freely choose an attorney." State Bar of Cal., Formal Ethics Op. No. 1988-04 (1988), *archived at* https://perma.cc/E4R5-YRL2.

It is useful to begin the discussion with Rule 1-500, because it addresses the specific issue presented here, and because it provides useful guidance on the manner in which § 16600 should be applied in the context of an agreement limiting the practice of law. California does not apply Rule 1-500 inflexibly—it does so in balance with the practical

necessities of the legal system and the other policies advanced by the Rules of Professional Conduct. In that vein, it recognizes that the "theoretical freedom" of each lawyer to choose their own clients, and each client to choose their own lawyer, is "actually circumscribed," and has decisively rejected the rule that "*all* agreements restricting" a lawyer's practice are prohibited. *Howard v. Babcock*, 6 Cal. 4th 409, 421–23 (1993) (emphasis added). Rather, Rule 1-500 permits "reasonable" restraints—ones where the "balance between competing interests" tilts in favor of enforcing the parties' agreement. *Id.* at 419 (quoting *Haight, Brown & Bonesteel v. Superior Court*, 234 Cal. App. 3d 963, 969 (1991)).

Some of the interests relevant here are manifest in the Rules of Professional Conduct themselves. The Rules are not a mere code of competition: They are intended to "protect the public and to promote respect and confidence in the legal profession," Cal. Rules of Prof'l Conduct 1-100, and embody a strong policy of attorney integrity in dealing with courts and other adjudicators. The Rules require that a California lawyer, "in presenting a matter to a tribunal, . . . [s]hall employ . . . such means only as are consistent with truth; [and s]hall not seek to mislead the [tribunal] by an artifice or false statement of fact." *Id.* Rule 5-200(A)–(B). California's strong public policy favoring settlement should also be taken into account. California generally encourages settlements, *see In re Cipro Cases I & II*, 61 Cal. 4th 116, 139 (2015), and, with respect to attorney discipline, the California Supreme Court has embodied that policy of consensual dispute resolution in California Rule of Court 9.21. Under Rule 9.21, an attorney charged with professional misconduct may ask the California Supreme Court to agree to allow the lawyer to resign from the bar in lieu of going through disciplinary proceedings.

There are strong reasons to be confident that a California court would find the state's interest in applying Rule 1-500 much diminished under the circumstances of this case, in which Mandelbrot has effectively admitted to misleading asbestos trusts by submitting unreliable evidence in support of his clients' claims. In entering into the settlement agreement, Mandelbrot stipulated that the evidence presented in the trusts' May 2013 letter supported a "reasonable" determination that he 1) was an unreliable source of evidence, and 2) had "engaged in a pattern and practice of filing unreliable evidence" with the three trusts. So as the district judge cogently stated, the debarment provision "does not deny the public access to a lawyer who prevailed against the [trusts] in a prior action. Instead, it protects the public"—as well as the trusts and their beneficiaries—"from one who submitted unreliable evidence." *In re J.T. Thorpe Inc. & Thorpe Insulation Co.*, 2015 WL 5167923, at \*6 (C.D. Cal. 2015). Moreover, in exchange for his agreement, Mandelbrot got something in return—the trusts' promise to dismiss their money claims with prejudice. In both function and form, then, the debarment provision mirrors the mechanism of agreed resignation in lieu of discipline that California applies in its own courts. Nor is there any significant interest on California's part in barring the use of a functionally identical mechanism to regulate practice before federally-sanctioned asbestos trusts.

Moreover, whatever limits Rule 1-500 puts on settlement in other contexts have little relevance here. In the context of settlement agreements restricting the practice of law, the primary concern is that they may limit the public's access to counsel, distort negotiations with considerations unrelated to the client, and create a conflict between the interests of the current client in a speedy settlement and future clients in

capable counsel. *See* ABA Comm. On Ethics and Professional Responsibility, Formal Op. 93-371 (1993). To the extent those interests apply here at all, they do so with diminished force: Mandelbrot is not here on behalf of a client, so there is no other subject of settlement negotiations to distract from, and no conflict with a present client's interests. And the fact that Mandelbrot did not enter into the debarment provision as part of settling a client matter means that arguably the most important interest animating Rule 1-500 has no relevance here. Indeed, the equivalent entry in the American Bar Association's model ethics rules— commentary on which California courts have consulted in applying the California rules, *Howard*, 6 Cal. 4th at 418 n. 5—*only* applies to "agreement[s] in which a restriction on the lawyer's right to practice is part of the settlement of a *client controversy*." Model Rules of Prof'l Conduct r. 5.6 (Am. Bar. Ass'n 2016) (emphasis added).

Section 16600's general regulation of professional restraints does not change the result under Rule 1-500 standing alone. To begin with, there is good reason to conclude that the California Supreme Court would agree that it makes little sense to read § 16600, a general regulation of professional restraints, as enacting a stricter rule than Rule 1-500, which takes into account the particular concerns of the legal profession. *See generally* Antonin Scalia & Bryan A. Garner, The Interpretation of Legal Texts 183–88 (1st ed. 2012). Indeed, even *outside* the context of legal practice, § 16600 has never been held to enact an absolute prohibition on professional restraints. It is true that California has a fundamental public policy against anticompetitive agreements. *See Application Grp., Inc. v. Hunter Grp., Inc.*, 61 Cal. App. 4th 881, 899–902 (1998). But outside of agreements intended to restrain competition—which have always been subject to the *per se* rule of illegality that

Mandelbrot wants applied here—California courts have consistently construed § 16600 by considering the public policies actually at stake in each case.

Mandelbrot's *per se* position relies heavily on the California Supreme Court's recent decision in *Edwards v. Arthur Andersen LLP*. *Edwards* concerned a contract that barred a departing accountant, for a limited time, from soliciting or working for his former firm's clients. 44 Cal. 4th 937, 942 (2008). The California court rejected the firm's argument that § 16600 "embrace[s] the rule of reasonableness in evaluating *competitive restraints*," *id.* at 947–48 (emphasis added), as well as the Ninth Circuit's view that the statute does not invalidate "narrow" restraints—ones that only affect a relatively small portion of a party's business, *id.* at 948–50. The court concluded that § 16600 flatly "prohibits employee noncompetition agreements." *Id.* at 942.

*Edwards*, however, did not abrogate decades of California law applying a rule of reason to agreements that restrain professional practice without anticompetitive purpose or effect. *Edwards* itself framed its conclusion narrowly in terms of "noncompetition agreements," *Id.*, distinguished two potentially inconsistent cases on the grounds that they did not "provide[] any guidance on the issue of noncompetition agreements," *id.* at 950 n.5, and relied entirely on cases involving noncompetition agreements for support.[5] Moreover, the California courts

---

[5] *See Muggill v. Reuben H. Donnelley Corp.*, 62 Cal. 2d 239 (1965); *Chamberlain v. Augustine*, 172 Cal. 285 (1916); *Thompson v. Impaxx, Inc.*, 113 Cal. App. 4th 1425 (2003); *D'sa v. Playhut, Inc.*, 85 Cal. App.

have applied *Edwards* consistent with their prior precedent applying a rule of reason outside the context of agreements meant to restrain competition.[6]

The debarment provision—which bars one lawyer from filing claims with four trusts out of the dozens currently in operation—is not a noncompetition agreement, and there is no evidence that it was negotiated "for an anticompetitive purpose." *See FLIR Sys., Inc. v. Parrish*, 174 Cal. App. 4th 1270, 1281–82 (2009). The provision's purpose, as the district court recognized, is clear: "to safeguard claimants from an attorney that the trusts find to be unreliable, as opposed to forcing the trusts to litigate the matter in the face of powerful evidence to its obvious conclusion." *In re J.T. Thorpe, Inc. & Thorpe Insulation Co.*, 2015 WL 5167923, at *6 (C.D. Cal. 2015). Under the particular circumstances of this case, the debarment provision is perfectly consonant with California's interest in regulating agreements restricting the practice of law.

---

4th 927 (2000); *Metro Traffic Control, Inc. v. Shadow Traffic Network*, 22 Cal. App. 4th 853 (1994).

[6] Compare the post-*Edwards* decision in *USS-POSCO Industries v. Case*, 244 Cal. App. 4th 197, 207–10 (2016) (distinguishing *Edwards*, and applying a rule of reason, because the challenged contractual provision was not "a quintessential noncompete agreement"), with *Great W. Distillery Prods., Inc. v. John A. Wathen Distillery Co.*, 10 Cal. 2d 442, 446 (1937) (holding that exclusive dealing and exclusive distributorship agreements do not violate § 16600 because they primarily create a mechanism for promoting trade, and restrain it only "incidentally"), *Martikian v. Hong*, 164 Cal. App. 3d 1130, 1133–34 (1985) (holding that California evaluates agreements with little anticompetitive effect for reasonableness under all the circumstances), and *Centeno v. Roseville Cmty. Hosp.*, 107 Cal. App. 3d 62, 68–72 (1979) (same).

Nor does our recent decision in *Golden v. California Emergency Physicians Medical Group*, 782 F.3d 1083 (9th Cir. 2015), require a different analysis. In that case, a medical services company, which operated a significant portion of California's emergency rooms, fired a doctor who specialized in emergency medicine. The doctor sued. As part of a settlement agreement, the doctor stipulated to "waive any and all rights to employment with [the company] or at any facility that [the company] may own or with which it may contract in the future." *Id.* at 1084–85, 1089. The question presented was whether § 16600 "prohibits a settlement agreement that may constrain a physician's freedom to practice medicine." *Id.* at 1084. The district court in that case answered a categorical "no," on the grounds that § 16600 only applies to covenants not to compete. *Id.* at 1089.

We reversed, explaining that, in addition to covenants not to compete, § 16600 also applies to "other contractual restraints on professional practice." The most important circumstance in Mandelbrot's case, however, was wholly absent from *Golden*: Dr. Golden's basic fitness to practice medicine was not called into question. But here, the debarment provision rests on the fact that Mandelbrot has effectively admitted to conduct that casts serious doubt on his fitness to practice law. The debarment provision is narrowly tailored to remedy that professional misconduct, which took place at the expense of a federally-supervised asbestos trust. And as shown above, such an agreement is consistent with the California courts' construction of Rule 1-500, and the California Supreme Court's authorization of resignations from the bar in lieu of discipline—agreements to settle claims of attorney misconduct that restrict the practice of law in the most draconian fashion.

This consideration aside, *Golden* does not say that *all* restraints on professional practice are prohibited. Instead it holds no more than that such restraints must be "of a substantial character" in order to fall within the purview of § 16600. *Golden* did not, however, reach the question of whether the no-employment provision in that case was a "substantial" restraint. Rather, we remanded to the district court to "determine [that] in the first instance" because the record was undeveloped. *Id.* at 1092–93.[7] *Golden* did not provide much guidance on what constitutes a "substantial" restraint in this context. We explained that a restraint may be "substantial" regardless of its "form or scope," but went no further. *See id.* at 1092. To give meaning to that standard, then, we look back to the California cases discussed above, *see supra* at 30–31, which clearly indicate that—outside the noncompetition context—§16600 bars only restraints that are unreasonable under all the circumstances.[8]

In sum, the United States has a strong interest in enforcing the debarment provision, and since it is

---

[7] On remand from our decision in *Golden*, the district court held that the no-employment provision was not a substantial restraint. 2016 WL 7799633 (N.D. Cal. 2016). An appeal from that order is pending as Case No. 16-17354.

[8] I would reach the same result under Nevada law, since the preceding analysis is perfectly applicable to that state as well as California. Briefly: Nevada has no statutory equivalent to Business & Professions Code § 16600, and its common law of restraints of trade is firmly grounded in a rule of reason. *See, e.g.*, *Golden Road Motor Inn, Inc. v. Islam*, 376 P.3d 151, 155 (Nev. 2016). And the state has simply adopted the American Bar Association's Model Rules of Professional Conduct, including Rule 5.6, which bars only "agreement[s] in which a restriction on the lawyer's right to practice is *part of the settlement of a client controversy*." (emphasis added). In light of our analysis of California law, no more needs to be said.

reasonable, California has no interest in invalidating it. Mandelbrot has identified no other deficiency in the lower courts' judgments enforcing the debarment provision. Those judgments should be affirmed.